SIMON, Justice.
 

 The defendant commercial partnership, Thomas W. Hooley & Sons, is appealing from the judgment of the district court awarding to the B. • & G. Crane Service, Inc., under a verbal contract covering’ the rental of a crawler crane and crew, the
 
 *680
 
 sum of $6,537.50, and dismissing its reconventional demand for damages in the amount of $10,470, allegedly resulting from a defect in the crane, or the negligent manner of its operation.
 

 The controversy arose out of the work connected with the dismantling and removal of the statue of Robert E. Lee and supporting column in the City of New Orleans, preparatory to its reconstruction after appropriate reinforcement. The contract for the dismantling work was awarded to the defendant under specifications that required the bidder to visit the site of the proposed work so as to familiarize himself with the facilities, difficulties, and restrictions for the satisfactory execution of the work. The successful bidder was also required to maintain at his own expense adequate protection of the property from any damage arising through the execution of the work and to “keep at all times during the progress of this work, a reliable superintendent, who shall represent the contractor in his absence, and who shall be held responsible for the class of workmanship to be done in strict conformance with these specifications,” and “to furnish all necessary equipment, tools and labor.”
 

 Preparatory to carrying out these specifications, Thomas W. Hooley, the senior partner of the defendant, entered into a verbal contract with Xavier Grilletta, president of the plaintiff crane corporation, for the rental of a crane with operator and oiler, at a stated rate of $22.50 an hour, which included, also, the maintenance of the crane.
 
 [1]
 
 The crane furnished by the plaintiff was rigged and equipped to handle a load of from seven and a half to eight tons.
 

 Each stone in the column was, under the specifications, designated by sections and numbers to facilitate the statue’s subsequent reconstruction, and, beginning on January 8, 1953, the stones in the column were, removed one at a time until on January 16, 1953, Section F was reached. When it became apparent that the four stones in this section were joined together and could not be removed individually, Hooley, who was on the job and assisting in the direction of the work with R. L. Truitt, the superintendent, after consulting with Truitt, ascertained from the crane operator, Grilletta,
 
 [2]
 
 that the crane could lift and lower this four-stone load, and they were then properly rigged together preparatory to proceeding. In the process, Hooley and Truitt discovered that Section F was not only bound together as one unit, but was also
 
 *682
 
 bound with the four stones in Section G, which comprized another unit. After further consultation between Hooley and Truitt, as well as with W. L. Guardia, through whose office in the city’s Division of Public Property the entire contract for the removal of the monument was being handled, and who was present at the time, Sections F and G were then rigged for removal together. Hooley, Truitt, and Guardia discussed the weight of these eight stones and, in fact, ascertained it approximated twelve tons, and while there is some conflict as to whether the crane operator was advised or knew of the intention to lift all eight stones at once, Hooley and Truitt both admitted Grilletta was not told that these stones weighed twelve tons. When the load was lifted, the operator, realizing the crane was overloaded, ordered the employee rigging on the boom to step down as a safety precaution, and when he attempted to lower the load, the brakes slipped and the stones crashed to the base of the monument causing a damage to the city’s property of $10,470, which the defendant paid.
 
 [3]
 
 Hooley urged this sum in reconvention when sued by the crane corporation for the rental of the machine and crew.
 

 As stated above, the defendant’s demand is grounded on the alleged negligence of the plaintiff, resulting from (1) defective brake equipment on the crane, or (2) failure of the operator to exercise due care.
 

 We think the evidence in the record overwhelmingly discloses the damage in this case was caused by the excess load placed on a crane equipped to lift and lower not more than seven and a half or eight tons, and was not due to any defect in the crane. As a matter of fact, the crane was used continuously thereafter without any repairs. Nor do we think there is evidence that would substantiate the claim that the crane was operated in a negligent manner. In any event, it is our opinion that it is immaterial whether the operator was negligent in attempting to lift such a load and in not replacing it,
 
 [4]
 
 under the issue of law raised by the plaintiff.
 

 It is the plaintiff’s contention that under the facts of this case, the crane operator, at the time the machine was leased, became the employee “pro hac vice”
 
 [5]
 
 of the lessee, the defendant-contractor; consequently, that any negligence on the part of such operator, if there was such, is imputable to the defendant as such employer, and
 
 *684
 
 not to the lessor of the machine. In the alternative, it is contended that even if the operator remained the employee of the lessor, then the defendant and the operator were joint tortfeasors and the plaintiff, as such, was relieved of all liability when Hooley voluntarily settled with the city. Neither of these contentions has been answered, or even mentioned, in the brief of the defendant.
 

 The legal consequences flowing from the acts of an operator furnished with a leased machine are becoming increasingly important in view of the heavy machinery and equipment necessary for modern-day construction, and the broad principles of law governing the doctrine of borrowed servant or employee “pro hac vice” have been applied in situations that require a determination of which of two masters is liable for the acts of the operator furnished in connection with the leasing of such equipment. These broad principles were set out at the turn of the century in the landmark decision of Standard Oil Co. v. Anderson, 212 U.S. 215, 29 S.Ct. 252, 253, 53 L.Ed. 480, in the following language:
 

 “One may be in the general service of another, and, nevertheless, with respect to particular work, may be transferred, with his own consent or acquiescence, to the service of a third person, so that he becomes the servant of that person, with all the legal consequences of the new relation. * * * It sometimes happens that one wishes a certain work to be done for his benefit, and neither has persons in his employ who can do it noi is willing to take such persons into his general service Hr may then enter into an agreement with another. If that other furnishes him with men to do the work, and places them under his exclusive control in the performance of it, those men become pro hac vice the servants of him to whom they are furnished. But, on the other hand, one may prefer to enter into an agreement with another that that other, for a consideration, shall himself perform the work through servants of his own selection, retaining the direction and control of them. In the first case, he to whom the workmen are furnished is responsible for their negligence in the conduct of the work, because the work is his work and they are, for the time, -his workmen. In the second case, he who agrees to furnish the completed work through servants over whom he retains control is responsible for their negligence in the conduct of it, because, though it is done for the ultimate benefit of the other, it is still, in its doing, his own work.
 
 To determine whether a given case falls within the one class or the other w-e must inquire whose is the work being performed,
 
 — a
 
 question which is usually answered by ascertaining who has the poiver to control and direct the servants in the performance of their
 
 work(Emphasis added.) See, also, the annotations at 1 A.L.R.2d 303; 17 A.L.R.2d 1388; 39 C.J. 558, Section 669; 56 C.J.S., verbo Master and Servant, § 330, p. 1093.
 

 
 *686
 
 This doctrine has also been applied in connection with the operators of cranes and other lifting equipment. Kristiansen v. Wagner’s Steel Erectors, 295 N.Y. 668, 65 N.E.2d 102; Pearson v. Arlington Dock Co., 111 Wash. 14, 189 P. 559; Western Marine & Salvage Co. v. Ball, 59 App. D.C. 208, 37 F.Zd 1004, certiorari denied 231 U.S. 749, 50 S.Ct. 353, 74 L.Ed. 1161; Mansfield v. Andrew Murphy & Son, 139 Neb. 793, 298 N.W. 749; Errickson v. F. W. Schwiers Co., 108 N.J.L. 481, 158 A. 482; Bojarski v. M. F. Howlett, Inc., 291 Pa. 485, 140 A. 544; Nepstad v. Lambert, 235 Minn. 1, 50 N.W.2d 614; Knutson v. Lambert, 235 Minn. 328, 51 N.W.2d 580; Dicenzo v. New York Shovel & Crane Corp., 282 App. Div. 741, 122 N.Y.S.2d 879; and Kessler v. Bates & Rogers Const. Co., 155 Neb. 40, 50 N.W.2d 553.
 

 This doctrine has also been recognized and applied by the courts of this state. See, Benoit v. Hunt Tool Co., 219 La. 380, 53 So.2d 137, and Dixie Machine, Welding & Metal Works, Inc. v. Boulet Transportation Co., La.App., 38 So.2d 546, the latter case being almost on all fours with the instant case.
 

 Applying the tests laid down in these decisions, and particularly the test upon which all eventually turn, i. e., who controls the servant in the named employment, we have no hesitancy in holding that the crane operator in the instant case was the servant of the defendant, and that the partnership was, therefore, liable for any and all negligence that might have been attributable to such operator. The operator originally obtained by the plaintiff to operate the crane leased by the defendant was not a regular employee of the plaintiff. He was secured from the union hall for this specific job. The work on which the crane was used was not the work of the plaintiff, but the work of the defendant. It was supervised by the senior partner of the partnership and directly by the defendant’s superintendent, Truitt. Hooley and Truitt both testified that the operator (and it is immaterial that the president of the plaintiff corporation substituted for the original operator when he became ill and no other could be obtained) had to take orders from the superintendent and that if the operator refused to obey those orders, he could be fired and another operator obtained. The method of demolishing the statue and pedestal was entirely under the control of the defendant company and the work required to be done under the city’s specifications a most careful and meticulous one. Had it not been for the fact that the original operator became ill, there would have been no necessity for any member of the plaintiff corporation being present at the site, and the member who was present was there only as the employee or servant of the defendant.
 

 The conclusion we have reached makes it unnecessary for us to consider the alternative contention of the plaintiff that if
 
 *688
 
 the crane operator remained the employee of the corporation, then the plaintiff and defendant were joint tort-feasors.
 

 For the reasons assigned, the judgment appealed from is affirmed, at the cost of the appellant.
 

 [1]
 

 . It is conceded by the defendant that on this scale it is indebted to the plaintiff in the amount of $6,537.50, and although in its suit the plaintiff had prayed for judgment in the amount of $6,732.50, on the trial it moved that this claim be reduced to the $6,537.50 indebtedness admitted by the defendant.
 

 [2]
 

 . The original crane operator, Fred McGoff, who had been obtained from the union for the job, became ill, and Grilletta, who was a duly qualified and authorized crane operator, took over the job when no other operator- could be obtained.
 

 [3]
 

 . Documentary evidence in the record discloses the defendant carried a $10,-000 policy covering property damage to this statue and column during the dismantling operations.
 

 [4]
 

 . Grilletta testified that once he lifted the stones, he could not replace them on the pedestal because they had broken loose as they swung into the boom and were about two and a half feet off center; consequently, that he had no alternative but to attempt to lower the stones.
 

 [5]
 

 .A Latin phrase meaning “for this occasion”.