132 So.2d 917 (1961)
V. B. McCUTCHEN, d/b/a McCutchen Construction Company, Plaintiff and Appellant,
v.
Deo FRUGE et al., Defendant and Appellee.
No. 168.
Court of Appeal of Louisiana, Third Circuit.
September 20, 1961.
*918 Charles R. Cassidy, Bernard N. Marcantel, Jennings, for plaintiffs-appellants.
Wesley H. Clanton, Eunice, for defendant-appellee.
Before TATE, SAVOY and HOOD, JJ.
HOOD, Judge.
This is a damage suit instituted by V. B. McCutchen, doing business as McCutchen Construction Company, against Deo Fruge and his liability insurer, arising out of the breaking of an oil pipeline owned by Lafitte Oil Traders, Inc. Defendant, Deo Fruge, reconvened for the sum of $695, being the amount claimed to be due him by plaintiff for labor and for the use of a D-7 caterpiller which plaintiff had rented from Fruge. During the course of the trial, plaintiff dismissed the suit against Fruge's insurer, leaving Fruge as the sole defendant. The trial court rendered judgment in favor of defendant Fruge, rejecting plaintiff's main demand, and in favor of Fruge, as plaintiff in reconvention, and against McCutchen on Fruge's incidental demand. From that judgment, plaintiff has appealed.
Plaintiff, who is engaged in oil field construction work, was engaged by the Texas and Pacific Coal and Oil Company to construct a road to a well site in Acadia Parish. In order to perform this job, plaintiff's supervisor, Arthur Richert, telephoned Deo Fruge, a dirt contractor, to hire a bulldozer and operator to construct the road to the well site. Defendant owned two bulldozers and he agreed to rent one to plaintiff and to supply an operator for it at a price of $13.50 per hour. Fruge was informed as to the general nature of the job for which the dozer and operator were being hired, but no written agreement was entered into between the parties, and Fruge did not obligate himself to complete the construction of all or any part of this road.
On the day that work was to begin on the road, August 29, 1958, Lindsey Bihm, who was employed by Fruge to operate the dozer, reported to McCutchen's office with the bulldozer. Richert then went to the site of the proposed road with Bihm, explained to Bihm the details of the road which McCutchen desired to have constructed, and he and Bihm went over the right-of-way planned for the road. At one point, the proposed road crossed an oil pipeline right-of-way which had become covered with small trees and underbrush. When Richert and Bihm came upon the pipeline right-of-way, they found a sign lying on the ground which indicated the presence of the pipeline. Richert stuck the sign upright in the ground and warned Bihm of the presence of the pipe. The pipe itself was not *919 visible, and since Richert did not know how deep in the ground it might be, he cautioned Bihm to "use all precautions when he crossed it and built the road." Bihm began his road building operations which took about four days to complete. On about the third day he reached the oil pipeline right-of-way, and while operating there he struck what he thought was a root or a stump. He supplied extra thrust to the dozer in order to uproot the obstacle, and in so doing he cut a gash in the pipeline which caused the oil being pumped through the line to begin flowing into the ditches alongside the new roadbed.
Bihm testified that he assumed the pipeline was about 36 inches below the ground, as was usually the case, and that it was located at about the point where Richert had stuck the marker in the ground. After Bihm had passed the marker he thought he had crossed the pipeline, and he had resumed his dozing operations when the accident occurred.
Bihm notified Richert of the accident immediately after the line was broken, and Richert thereupon called McCutchen and then went to the scene of the break. McCutchen notified the Lafitte Oil Traders, Inc., and requested that it shut down its pumping operations. Lafitte Oil Traders complied and immediately sent a crew to help repair the break. When Richert arrived on the scene, he directed Bihm to dam up the ditches into which the oil was flowing in order to catch as much of the oil as possible. Fruge, the defendant, was not notified of the break in the pipeline until Bihm told him about it that night.
Both McCutchen and Lafitte Oil Traders used men and equipment to repair the break and to salvage the oil which escaped from the pipeline. As a result, Lafitte Oil Traders billed McCutchen in the amount of $957.30 for the labor and equipment which Lafitte had used in this operation. McCutchen paid this sum to Lafitte and he received a conventional release and assignment of the claim from it. In addition to the amount which McCutchen paid Lafitte, McCutchen also incurred expenses for labor and equipment in this repair operation amounting to the sum of $444.75. McCutchen was indebted to Fruge in the amount of $695.25 for the use of the dozer and operator, but he refused to pay Fruge this amount until Fruge agreed to pay him $1,402.05, being the total amount of damages which McCutchen sustained as a result of Bihm's cutting the pipeline. Fruge refused to pay, and as a result this suit was filed.
McCutchen contends that Fruge was an independent contractor, that Bihm was Fruge's employee, and that Fruge was liable for the torts of Bihm. Fruge, on the other hand, contends that Bihm was the borrowed servant, or the employee "pro hac vice," of McCutchen at the time the accident occurred, and accordingly that Fruge was not liable for Bihm's torts. Fruge also contends that he is not liable for damages, even if he should be held to be an independent contractor and the employer of Bihm, because the cutting of the pipeline resulted solely and only from the failure of McCutchen or his employees to point out with particularity the location of the pipeline and its depth.
The trial court held that Fruge was not an independent contractor at the time the accident occurred; that under the borrowed servant doctrine Bihm was the employee of McCutchen; and that Bihm was not negligent. Accordingly, judgment was rendered rejecting McCutchen's demands. Since there was no dispute as to the amount which McCutchen owed Fruge for the use of the dozer and operator, judgment also was rendered in favor of Fruge, as plaintiff in reconvention, and against McCutchen for the sum of $695.
The principal question presented here is whether Bihm was the employee of McCutchen under the borrowed servant doctrine, or whether he was the employee of Fruge as an independent contractor in the building of this road.
The issue of whether a worker is a "borrowed employee" or an employee of an *920 independent contractor has been considered frequently by the appellate courts of this State. Some of the cases in which this or related questions have been considered are: Beck v. Dubach Lumber Co., 171 La. 423, 131 So. 196; Benoit v. Hunt Tool Co., 219 La. 380, 53 So.2d 137; Amyx v. Henry & Hall, 227 La. 364, 79 So.2d 483; B & G Crane Service v. Thomas W. Hooley & Sons, 227 La. 677, 80 So.2d 369; Eames v. Alexandria Contracting Co., La.App. 2 Cir., 154 So. 510; Merritt v. E. L. Bruce Co., La.App. 2 Cir., 166 So. 195; Davidson v. American Drug Stores, La.App. Orleans, 175 So. 157; Gallaher v. Ricketts, La.App. Orleans, 187 So. 351 (decree recalled on other grounds, 191 So. 713); Dixie Machine, Welding & Metal Works v. Boulet Transp. Co., La.App. Orleans, 38 So.2d 546; Fontenot v. National Transfer Company, La.App. 1 Cir., 99 So.2d 795 (certiorari denied); Malloy v. Buckner-Harmon Wood Contractors, La.App. 2 Cir., 100 So.2d 242 (certiorari denied); Miller v. B. Lewis Contractors, La.App. 1 Cir., 103 So.2d 592 (certiorari denied); Thompson v. National Surety Corp., La.App. 2 Cir., 124 So.2d 227.
In determining whether there is liability under the borrowed servant doctrine, there is a presumption that the general employer is responsible in damages for the torts of his employee, and the burden of proof rests upon him to show that as to the particular work in question the servant has been lent, and that he was not the general employer's servant at all. Benoit v. Hunt Tool Co., supra. In this case, therefore, there is a presumption that Fruge is responsible for the acts of Bihm which caused the damage, and the burden of proof rests upon Fruge to establish that the relationship of master and servant which existed between him and the operator of the bulldozer had been suspended, and that a new relationship between Bihm and McCutchen had been created and was in existence at the time of the accident.
Although varying rules and tests have been applied in determining whether or not an employee is to be classified as a "borrowed servant," we think it is now settled that the most important test to be applied in determining the status of the employee is to ascertain who controls him in that employment, and more particularly, who has the power and right to control and direct him in the performance of his work.
In the landmark case of Standard Oil Company v. Anderson, 212 U.S. 215, 29 S. Ct. 252, 253, 53 L.Ed. 480, which case has been cited repeatedly by Louisiana courts, the Supreme Court of the United States said:
"* * * One may be in the general service of another, and, nevertheless, with respect to particular work, may be transferred, with his own consent or acquiescence, to the service of a third person, so that he becomes the servant of that person, with all the legal consequences of the new relation.

* * * * * *
"It sometimes happens that one wishes a certain work to be done for his benefit and neither has persons in his employ who can do it nor is willing to take such persons into his general service. He may then enter into an agreement with another. If that other furnishes him with men to do the work, and places them under his exclusive control in the performance of it, those men become pro hac vice the servants of him to whom they are furnished But, on the other hand, one may prefer to enter into an agreement with another that that other, for a consideration, shall himself perform the work through servants of his own selection, retaining the direction and control of them. In the first case, he to whom the workmen are furnished is responsible for their negligence in the conduct of the work, because the work is his work, and they are, for the time, his workmen. In the second case, he who agrees to furnish the completed work through servants over whom he retains control is responsible for their *921 negligence in the conduct of it, because, though it is done for the ultimate benefit of the other, it is still, in its doing, his own work. To determine whether a given case falls within the one class or other we must inquire whose is the work being performed, a question which is usually answered by ascertaining who has the power to control and direct the servants in the performance of their work. Here we must carefully distinguish between authoritative direction and control, and mere suggestion as to details or the necessary cooperation, where the work furnished is part of a larger undertaking."
In Benoit v. Hunt Tool Company, 219 La. 380, 53 So.2d 137, 140, the defendant, Hunt Tool Company, was engaged in the welding business and had several welders which it furnished, with all materials and equipment, to its customers on an hourly basis. Morris & Meredith, Inc., a corporation engaged in the oil well drilling business, engaged Hunt Tool Company to render welding services for it, for which it was to pay $5.50 per hour. From day to day there would be dispatched to the site of the rig one or more welders, together with their helpers and welding supplies. The welding crew so dispatched was in charge of Henry Guillory, a general employee of Hunt Tool Company, who directed and supervised the welding operations. Upon arrival at the site of the rig, the foreman of Morris & Meredith would give directions as to what things were to be welded and as to what hours the welders were to start and stop working. The method of accomplishing the work, however, and the type welding procedures to be used, were left entirely up to the welders. The Supreme Court in holding that the welders in that case were not "borrowed servants" of Morris & Meredith, said:
"It is a well settled principle of law that the master is liable for the torts of his servant committed in the scope and course of his employment, but it is often difficult where two possible masters are involved to determine which is liable for the tort, and to determine such liability we must look to the doctrine of the borrowed servant or employee pro hac vice. In determining liability under this doctrine in some cases the courts have imposed liability on the person in whose business the employee was engaged at the time the tort was committed. In others the test has been the right of control over the servant at the time the tort was committed. It has been pointed out that in applying the latter test it is often difficult to decide just what fact or facts constitute control. Mere division of control does not, in itself, raise the presumption of surrender of control, but there is a presumption that the general employer is liable, and it rests upon him to show that, as to the particular work in question, the servant has been lent and is performing only the borrower's work, and that he was not the defendant's servant at all. It has been said that even the control test is not an infallible one, and that the elements of each case must be taken into consideration. Where, however, it is clear that control by the defendant was coupled with performance for the defendant and in the defendant's business, the result is certain.

* * * * * *
"Under the circumstances of this case we conclude that it was the work of Hunt Tool Company which was being performed, and that that company had not relinquished the right to control Guillory in the performance of it. The fact that the official of Morris & Meredith suggested that Guillory use an electric torch in the welding of the tank, and that Morris & Meredith pointed out the welding to be done, did not constitute authoritative direction and control but was merely suggestion as to details and constituted necessary cooperation in the work being *922 furnished in the larger undertaking." (Emphasis added.)
The facts in B & G Crane Service v. Thomas W. Hooley & Sons, 227 La. 677, 80 So.2d 369, 372, are similar to those in the instant suit. In that case defendant had rented a crane, with operator and oiler, at a price of $22.50 per hour, which included the maintenance of the crane. While heavy stones were being lifted the brakes on the crane slipped, causing damages. The owner of the crane sued for the amount due as rent, and defendant thereupon reconvened for damages on the ground that the brakes on the crane were defective and the operator was negligent. The crane was found to be not defective, and the issue was then presented of whether the operator of the crane was a borrowed employee, or an employee "pro hac vice," of the defendant. The evidence showed that the crane operator was under the supervision of defendant and that he had to take orders from defendant's superintendent. (The operator originally obtained by plaintiff became ill, and the president of plaintiff company was actually operating the crane at the time the accident occurred.) The Supreme Court rejected defendant's reconventional demand for damages, holding that the crane operator was the servant of defendant under the borrowed servant doctrine, and that defendant accordingly was responsible for the negligent acts of that operator. The Court, after citing numerous cases, including Standard Oil Company v. Anderson and Benoit v. Hunt Tool Company, supra, said:
"Applying the tests laid down in these decisions, and particularly the test upon which all eventually turn, i. e., who controls the servant in the named employment, we have no hesitancy in holding that the crane operator in the instant case was the servant of the defendant, and that the partnership was, therefore, liable for any and all negligence that might have been attributable to such operator. * * * The work on which the crane was used was not the work of plaintiff, but the work of defendant. It was supervised by the senior partner of the partnership and directly by the defendant's superintendent, Truitt. * * *"
The case of Amyx v. Henry & Hall, 227 La. 364, 79 So.2d 483, 486, involved a damage suit arising out of a collision between two gravel trucks, one of which was owned by a partnership, and at the time of the accident it was being driven by one of the partners, Dan Guin. Defendant, Henry & Hall, had hired Guin's truck, together with his services as a driver, for the purpose of hauling gravel at the rate of $2 per cubic yard, with all of the oil and gas to be paid for by Guin. There was no agreement as to how many yards of gravel Guin would have to haul, and either party could terminate the agreement at any time, without any liability. Defendant's foreman supervised the loading of the truck and instructed the driver as to where the gravel was to be hauled. The Supreme Court held that Guin was not an independent contractor, that the relationship of Guin and defendant was that of master and servant, and accordingly that defendant was responsible in damages for the acts of Guin. In so holding, the court said:
"The term `independent contractor', as was said in the case of Gallaher v. Ricketts, La.App., 187 So. 351, 355, `connotes a freedom of action and choice in respect of the undertaking and a legal responsibility on the part of the contractor in case the agreement is not fulfilled in accordance with its covenants.' A contractee-independent contractor relationship presupposes a contract between the parties. It likewise presupposes the independent nature of his business, and is not exclusive as to the means whereby it is accomplished. It should appear that the contract calls for a specific piecework as a unit to be done according to his own methods, without being subject to the control and direction, in the performance *923 of the service of his employer, except as to the result of the services to be rendered. It must also appear that a specified price for the overall undertaking is agreed upon; that its duration is for a specified time and not subject to termination or discontinuance at the will of either side without a corresponding liability for its breach.

* * * * * *
"Defendant was not obligated to keep the services of Guin until he had finished any specified amount of work or for any definite period of time, nor was Guin obligated to `stay on' the job for any particular time or for the completion of the hauling of a specified or contracted quantity. Either could have terminated the relationship at his pleasure, and neither might have had any cause of action to recover damages as a result of a breach of the contract, or by the sudden arbitrary or capricious termination of the work relationship between them. Mutuality of obligations being the essence of contracts, it is undisputed that Guin and the defendant had no obligations whatsoever, except in respect to their own respective wishes, and no liability could legally attach by exercising this privilege.

"We must conclude that being terminable at the will of either party that fact alone is sufficient, when considering the other circumstances of the employment, to signify that the contract created a relationship of master and servant." (Emphasis added.)
In Miller v. B. Lewis Contractors, 103 So.2d 592, plaintiff was an employee of the Power Rig Drilling Company which had contracted to drill an oil well. In connection with the erection of the derrick, Power Rig hired a dragline and its crew from defendant at $14.00 per hour. No contract was entered into, and Power Rig's tool pusher was in charge of erecting the derrick. Under those circumstances the First Circuit Court of Appeal held that the operator of the dragline was a borrowed servant of Power Rig, that he was a fellow employee of plaintiff, and accordingly that defendant was not responsible for the actions of the operator.
In Malloy v. Buckner-Harmon Wood Contractors, 100 So.2d 242, 249, the Court of Appeal, Second Circuit, after quoting extensively from the Amyx case, said:
"As we appreciate the above requirements the court said, in effect, that in order to fix the status between the parties as principal and contractor there must be an actual contract for a specific (a) undertaking, or (b) amount of work, or (c) services rendered, and, further, that such contract must embody a definite period of time within which the undertaking is to be performed.
"We think it is clear that the court also measures the question of the existence vel non, of a contractual agreement in the light of the assurance to both parties thereto of a right to enforce the terms or provisions of the agreement.

* * * * * *
"The agreement in the instant case, as evidenced by the facts hereinabove recapitulated, is one of those vague and uncertain oral `arrangements' or `understandings' which manifest none of the requisites of a contract and which effected only an employment. It follows that the exceptions should have been overruled."
Although the instant suit is not an action for workmen's compensation benefits, we think it is significant to note that an "Independent Contractor" is defined in the Workmen's Compensation Act as follows:
"(6) `Independent Contractor' means any person who renders service, other than manual labor, for a specified recompense for a specified result either as a unit or as a whole, under the control *924 of his principal as to results of his work only, and not as to the means by which such result is accomplished, and are expressly excluded from the provisions of this Chapter unless a substantial part of the work time of an independent contractor is spent in manual labor by him in carrying out the terms of the contract, in which case the independent contractor is expressly covered by the provisions of this Chapter." LSA-R.S. 23:1021(6). (Emphasis added.)
The evidence in the instant case establishes that an oral agreement was entered into between plaintiff and defendant to the effect that defendant would supply a bulldozer, with an operator, and that plaintiff would pay defendant a specified amount per hour for the use of that machine. Although Fruge was told the general nature of the work which was to be done, he did not obligate himself to build the road or to complete a specific unit of work. There was no agreement as to a price to be paid for the completed job and no time limit was specified within which the work was to be completed. Either Fruge or McCutchen could have terminated the agreement at any time, without liability on the part of either for breach of contract. Under those circumstances, and in view of the jurisprudence hereinabove cited, we think the trial judge correctly held that defendant Fruge was not an independent contractor in this instance.
The evidence establishes that Bihm was a regular employee of Fruge and his salary was paid by defendant. Fruge carried workmen's compensation insurance covering the operator of this bulldozer. As the employer, he withheld taxes from Bihm's salary and paid the latter's Social Security taxes. McCutchen had the right to discontinue using the bulldozer or the services of Bihm at any time, but he did not have the right to terminate Bihm's employment by Fruge. All fuel, grease, repairs and operating expenses of the bulldozer were provided by defendant.
The evidence further shows, however, that under the agreement entered into between McCutchen and Fruge, McCutchen had the right to control and direct Bihm in all of the work which was being performed by the bulldozer. When Bihm first reported to work with the bulldozer, McCutchen's supervisor gave him instructions as to the location, width and type of road which was desired. Plaintiff's supervisor then returned to the site from time to time thereafter to see if Bihm was following the right of way and was "getting along like we expect." Immediately after the oil pipeline was cut, McCutchen's supervisor instructed Bihm to take his bulldozer off the road and to use it in digging a hole at another location and to construct a dam across a gully in order to catch the oil which was escaping. These instructions were complied with by Bihm. Fruge visited the site of this job only one time for the purpose or spot checking his operator to see if the machine was being operated in the proper gear ratio. Fruge, however, did not at any time exercise any supervision over Bihm or give him any instructions or directions in connection with the construction of this road. McCutchen had the right, if he so desired, to require Bihm to discontinue working on that road, or to leave that job uncompleted for any reason and to work on some other project at another place. In our opinion, the evidence establishes that at the time the accident occurred Bihm was performing work for McCutchen, in the latter's business, and that McCutchen, through his supervisor, controlled and had the right to control and direct Bihm in the work which he was performing.
In view of the fact that Fruge was not an independent contractor, that the operator of the bulldozer was performing the work of McCutchen, and that McCutchen had the right and power to control and direct Bihm in the performance of his duties, we conclude that at the time the accident occurred Bihm must be classified as the borrowed servant, or the employee "pro *925 hac vice," of McCutchen. Bihm's general employer, therefore, was not responsible in damages for the torts committed by him, and accordingly there is no liability on the part of defendant Fruge in this case.
Since we have concluded that Fruge is not responsible for the torts committed by Bihm, it is not necessary for us to consider the question of whether Bihm was negligent in cutting or damaging the oil pipeline.
For the reasons herein assigned, the judgment of the district court is affirmed. All costs of this appeal are assessed to plaintiff-appellant.
Affirmed.