198 So.2d 119 (1967)
Sebastian J. KEZERLE, Plaintiff-Appellee,
v.
HARDWARE MUTUAL CASUALTY COMPANY and Herbert Young, Defendants-Appellants.
No. 1949.
Court of Appeal of Louisiana, Third Circuit.
April 26, 1967.
Rehearing Denied May 18, 1967.
Writ Refused June 9, 1967.
*121 Bodenheimer, Looney & Jones, by G. M. Bodenheimer, Jr., Shreveport, for defendants-appellants.
John P. Godfrey, Many, for plaintiff-appellee.
John G. Miller, Jr., New Orleans, for intervenor-appellee.
Before CULPEPPER, SAVOY and HOOD, JJ.
HOOD, Judge.
Plaintiff, Sebastian J. Kezerle, sues for damages for personal injuries which he sustained when a derrick on which he was working fell. He was employed by Smackover Drilling Company, Inc., at that time, and he has received workmen's compensation benefits from his employer's insurer since the date of the accident. The defendants are Herbert Young, Robert E. Adair, Jr. (doing business as Trey Construction Company) and Hardware Mutual Casualty Company, the last named defendant being the liability insurer of Adair. Employers Mutual Liability Insurance Company of Wisconsin, the workmen's compensation insurer of Smackover, filed an intervention seeking to recover from defendants the amount which it had paid to plaintiff as workmen's compensation benefits.
Judgment on the merits was rendered by the trial court in favor of plaintiff and against all of the defendants for $42,910.80, less the amount of compensation benefits paid. Judgment also was rendered in favor of intervenor for the amount it has paid to plaintiff as workmen's compensation benefits. Defendants Adair and Hardware Mutual Casualty Company have appealed, but no appeal has been taken by defendant Young. Plaintiff has answered the appeal demanding that the amount of the award be increased.
The accident which gave rise to this suit occurred on December 31, 1964, in Sabine Parish. Smackover Drilling Company had just completed the drilling of a well in search for oil or gas, and on that date it was in the process of "rigging down" so that the derrick and rig could be moved to another location. Plaintiff was working for Smackover as a derrick man on this rig at that time, and he was assisting in rigging down the derrick when the accident occurred.
*122 The derrick was a telescope type derrick, composed of two sections, and constructed in such a way that the upper section could be lowered or "scoped" into the lower one. When fully extended and in use, the derrick was about 86 feet high, and it was supported by four steel cables which ran from the top of the derrick to an anchorage on the ground. When the upper section is scoped into the lower section the derrick is about 50 feet high. Before the derrick can be moved it is necessary to lower the upper section of the derrick and for someone to climb to the top of the lower section to tie off the rotary hose. After the upper section has been lowered and the rotary hose has been tied off, the procedure for moving the derrick is to stack or lay it on a trailer and then to haul it to its new location. The steel cables which support the derrick while it is in use must be loosened or disconnected from the ground anchorage, of course, before the upper section of the derrick can be lowered.
The route which the truck and trailer would have to take in moving this rig to its new location led to and across a creek or stream of water, about 15 feet wide, located between 100 and 150 feet from and in front of the rig. Employees of Smackover decided to fill the creek with dirt at the point where it was to be crossed, and to build a roadway across that stream over which roadway the truck and trailer could travel in moving the rig.
The day before the accident occurred, Chandler B. Rawls, the tool pusher employed by Smackover, contacted an employee of Trey Construction Company by telephone and arranged for that company to furnish a bulldozer and operator to fill in this creek and to build the roadway. Pursuant to Rawl's request, Trey Construction Company sent Herbert Young, a bulldozer operator employed by it, to the site on December 30, 1964, and while he was there Rawls pointed out to him the part of the creek which he wanted filled, instructed him to get the dirt for this fill from a little hill between the rig and the creek, and suggested that Young also push some timber into the creek with the dirt in order that the trucks would not bog down. A bulldozer owned by Trey Construction Company had been left near the rig a few days before that date. Young cleaned the right of way for the road that afternoon, using the bulldozer which was there, and he planned to return the next day to fill in the creek and build a roadway across it.
Young reported to the site of the rig the following morning, December 31, and began filling in the creek with timber and dirt, using Trey's bulldozer for that purpose. Shortly after Young began filling in the creek, plaintiff climbed to a point near the top of the telescoped derrick for the purpose of tying off the rotary hose, that being necessary before the rig could be moved. While plaintiff was on the derrick for that purpose, the blade of the bulldozer operated by Young caught a guy wire, one end of which was fastened to the top of the derrick, and the bulldozer then pulled the derrick over, causing it to fall to the ground. Plaintiff jumped clear of the derrick just before it struck the ground, but the fall caused him to sustain serious injuries which will be described later in this opinion.
Plaintiff contends that the sole proximate cause of the accident was Young's negligence in operating the bulldozer, that his negligence is imputed to his employer, and that plaintiff thus is entitled to recover damages from Young, Adair and the latter's liability insurer. The defendants deny any negligence on the part of Young, and alternatively they plead contributory negligence on the part of plaintiff as a bar to his recovery. Also defendants affirmatively plead that Young "was a borrowed servant or employee pro hac vice of Smackover Drilling Company, the employer of petitioner, and, therefore, petitioner's recovery is limited to the Louisiana Workmen's Compensation Act under the terms and conditions of said Act."
The trial court held that Young was negligent in operating the bulldozer, that his *123 negligence was the proximate cause of the accident, that plaintiff was free from contributory negligence, that Young was not the borrowed servant of Smackover, and that plaintiff is entitled to recover damages from defendants.
The issues which were raised in the pleadings as to whether the accident was caused by the negligence of Young in the operation of the bulldozer and as to whether plaintiff is barred from recovery by his own contributory negligence have not been argued by either party in this court. We, nevertheless, have considered these issues, and have concluded that the proximate cause of the accident and the resulting injuries sustained by plaintiff was the negligence of Young in failing to maintain a proper lookout while operating the bulldozer, and in causing that machine to strike a steel cable which was fastened to the top of the derrick. We find no negligence on the part of plaintiff, and we agree with the trial court that he is not barred from recovery because of his own contributory negligence.
We direct our attention next to the question of whether Young was a borrowed servant, or an employer pro hac vice, of Smackover Drilling Company at the time this accident occurred. If Young was a borrowed servant of that company, then the relationship of master and servant which theretofore existed between Adair and Young must be held to have been suspended, and Adair and his insurer would not be liable in damages for the acts of Young. On the other hand, if the evidence fails to show that Young became the borrowed servant of Smackover, then he must be held to have been acting as the employee of his general employer, Adair, when the accident occurred, and the latter will be responsible in damages for his acts of negligence. Benoit v. Hunt Tool Co., 219 La. 380, 53 So.2d 137 (1951); McCutchen v. Fruge, 132 So.2d 917 (La.App.3d Cir. 1961).
The evidence shows that at the time this accident occurred Smackover was engaged in the business of drilling wells in search of oil and gas. It did not engage in any earth moving or oil field construction work, and it did not own any equipment designed for performing that type of work. When Smackover needed to have earth moving or oil field construction work done, it always engaged outside contractors to do it. It frequently engaged Trey Construction Company to do earth moving or oil field construction work for it, but on occasions it had used other earth moving contractors.
Trey Construction Company specialized in earth moving work, in oil field construction work and in oil field trucking. It also leased or hired out earth moving equipment, with or without operators, for use in performing that type of work. Adair, owner of Trey Construction Company, testified that he frequently had performed earth moving and oil field construction jobs for Smackover and for other customers, including some public bodies. He explained that some of these jobs were performed pursuant to contracts and that others were performed for an hourly charge. He stated that when the jobs are performed on an hourly basis, the customer uses the dozer and operator in any way he sees fit, but that even under that arrangement the dozer remained under his control, and that he "never did relinquish the right to go out on the job and give instructions" to his operators, although he says he "never countermanded an order given by a customer." He testified that he set rules for the operators to follow because he didn't want them to hurt anything or themselves or the equipment, and that his operators were instructed to not comply with the orders of a customer if they felt that it would be dangerous to persons or equipment. Adair employed a foreman, named Allen Smith, and he stated that he and Smith "supervised" the jobs being done by his equipment and his employees, but that this supervision consisted of "going out there and checking and making sure that everything is going all right."
In this instance, the agreement between Smackover and Trey was that the latter *124 was to furnish a bulldozer and operator to perform earth moving work for Smackover for a charge of $13.75 per hour. One of Trey's employees kept a record of the number of hours worked, and he filled out tickets showing the time spent on the job. These tickets were approved by Rawls as they were presented to him, and Smackover was billed for the amounts due as shown on these tickets. The charges for performing the earth moving work were paid to Trey Construction Company, and no payments were made by Smackover to Young. Young was employed by Trey Construction Company, his salary was paid by that company and he could be fired only by that employer. If Smackover became dissatisfied with Young or the way he was performing the work, it could dismiss him from the job and send him back to Trey, but it, of course, could not discharge him from his employment by Trey.
The issue of whether a worker is a borrowed servant or an employee pro hac vice of someone other than his general employer has been considered many times by our appellate courts. See cases cited in B & G Crane Service v. Thomas W. Hooley & Sons, 227 La. 677, 80 So.2d 369 (1955); McCutchen v. Fruge, 132 So.2d 917 (La. App.3d Cir. 1961); and Truitt v. B & G Crane Service, Inc., 165 So.2d 874 (La.App. 4th Cir. 1964).
In these cases the courts have consistently held that there is a presumption that the general employer is responsible in damages for the torts of his employee. If the general employer seeks to avoid liability on the ground that his employee is the "borrowed servant" of another, then the burden of proof rests upon the general employer (defendant Adair in this case) to show that as to the particular work in question the servant has been loaned, that the relationship of master and servant which theretofore existed between the general employer and employee has been suspended, that a new relationship of master and servant has been created between the borrowing employer and that employee and that this new relationship was in existence at the time the accident occurred.
A test which has been applied consistently in determining whether a person is a borrowed servant is to ascertain who controls him in that employment, and who has the power and right to control and direct him in the performance of his work. In order to establish that the employee is the borrowed servant of another, we think it is essential for the general employer to establish, among other necessary elements of proof, that the borrowing employer exercises control over the employee and has the right to control him, that the general employer has relinquished the right to control him, and that the employee is performing work for the borrowing employer and in the latter's business.
The issues presented in the instant suit are identical with those which were presented in Benoit v. Hunt Tool Company, supra. In that case the general employer, Hunt Tool Company supplied equipment and a crew to do welding for Morris & Meredith, oil well drillers, under an agreement whereby Hunt would be paid on an hourly basis for the work done by each welder and helper. Performing welding services was a part of the business of Hunt Tool Company, but it was not included in the business of Morris & Meredith. The welders were required to report to the foreman of Morris & Meredith each day, and the foreman would then instruct them as to what objects were to be welded, the hours they were to work and when they were to leave and return to the job. Two employees of Morris & Meredith were injured by the negligent acts of one of Hunt's employees, and they sued Hunt Tool Company for damages. Hunt resisted on the ground that the negligent employee was the borrowed servant of Morris & Meredith. Our Supreme Court held that the employee was not the borrowed servant of Morris & Meredith, and that plaintiffs could recover *125 in tort from Hunt. In so holding, the court said:
"In the instant case Guillory was in the general employ of Hunt Tool Company, which selected him, paid his wages, and had the right to discharge him for any cause. By agreement with Morris & Meredith, Hunt Tool Company was to do its regular business through its servants in the common way, and Guillory was doing the work of this defendant, that is, rendering welding service, for which it was to receive an agreed compensation. The materials and welding equipment were its own. The work was done by the defendant for a price as its own work by and through its own instrumentalities and servants in its general employ. * * *
"Under the circumstances of this case we conclude that it was the work of Hunt Tool Company which was being performed, and that that company had not relinquished the right to control Guillory in the performance of it. The fact that the official of Morris & Meredith suggested that Guillory use an electric torch in the welding of the tank, and that Morris & Meredith pointed out the welding to be done, did not constitute authoritative direction and control but was merely suggestion as to details and constituted necessary cooperation in the work being furnished in the larger undertaking.
"We therefore conclude that Guillory was not the borrowed servant of Morris & Meredith but was the servant or employee of Hunt Tool Company at the time the accident occurred." (Emphasis added.)
Under the rule applied in Benoit v. Hunt Tool Company, supra, Young clearly cannot be held to have been the borrowed servant of Smackover, since his general employer had not relinquished control over him and he was not performing the work of Smackover.
Defendants rely heavily on the cases of Truitt v. B & G Crane Service, Inc., 165 So.2d 874 (La.App. 4th Cir. 1964); McCutchen v. Fruge, et al., 132 So.2d 917 (La. App. 3d Cir. 1961); and B & G Crane Service v. Thomas W. Hooley & Sons, 227 La. 677, 80 So.2d 369 (1955). In each of these cases it was determined that the employee whose negligent act caused the damage was the borrowed servant, or employee pro hac vice, of a party other than the general employer. The facts in each case are different from the facts presented here, however, and for that reason we have concluded that a different result must be reached in the instant suit.
In Truitt v. B & G Crane Service, Inc., supra, for instance, the defendant leased a crane, with an operator, to Favrot & Fruin-Colnon, who were general contractors engaged in constructing a large industrial plant. Plaintiff, an employee of the general contractor, was injured as a result of the negligence of the operator of the crane. Our brothers of the Fourth Circuit held that the operator of the crane was the borrowed servant of the general contractor, and that plaintiff could not recover from B & G Crane Service, the general employer of the operator. The evidence showed, however, that the crane operator at all times was under the complete control and direction of the general contractor, and that the work which was being performed by the operator of the crane was the same type of work which the general contractor was engaged in performing. The court noted that the foreman of the general contractor controlled every movement of the crane operators, indicating to them what was required to be done, which materials were to be picked up or moved or hoisted, and in what order and where they were ultimately to be placed. Unlike the facts in the instant suit, therefore, it appears that the general employer in the Truitt case had surrendered complete control of the employee to the borrower, and that the employee was performing the type *126 of work ordinarily performed by the borrowing employer.
In McCutchen v. Fruge, supra, the plaintiff was engaged in oil field construction work, which included the construction of roads to well sites. He arranged with the defendant, a dirt contractor, "to hire a bulldozer and operator to construct the road to the well site," which was exactly the type of work which McCutchen was engaged in performing. Also, the record shows that plaintiff, as the borrowing employer, exercised complete supervision and control over the operator of the bulldozer, and he even changed the duties of the operator from building a road to constructing a dam. In deciding the McCutchen case we pointed out that it differed from Benoit v. Hunt Tool Company, supra, in that, unlike the facts in the Benoit case, McCutchen exercised complete control over the operator, the owner of the bulldozer surrendered control over that employee, and the machine and operator were performing the same type of work as that performed by the borrowing employer.
In B & G Crane Service v. Thomas W. Hooley & Sons, supra, plaintiff leased a crane, with an operator, to defendant on an hourly rental basis. Plaintiff sued to recover the rental alleged to be due, and defendant reconvened for damages resulting from the alleged negligence of the operator of the crane. The district court awarded plaintiff the amount due as rental, and it rejected defendant's reconventional demand, assigning as reasons therefor that the crane operator was the borrowed servant of the defendant. In affirming the judgment of the trial court, our Supreme Court observed that "[t]he work on which the crane was used was not the work of the plaintiff, but the work of the defendant (the borrowing employer). It was supervised by the senior partner of the partnership and directly by the defendant's superintendent, Truitt." The court also noted that the operator of the crane was not a regular employee of the plaintiff, but that he had been secured from the union hall simply for that specific job, and that the defendant not only exercised complete supervision over him but that he also had the right to fire the operator if he did not perform his work satisfactorily. The Court significantly quoted and emphasized some language used in Standard Oil Company v. Anderson, 212 U.S. 215, 29 S.Ct. 252, 53 L.Ed. 480, as follows:
"To determine whether a given case falls within the one class or the other we must inquire whose is the work being performed,a question which is usually answered by ascertaining who has the power to control and direct the servants in the performance of their work."
In the instant suit the evidence shows that Smackover did not exercise complete control over Young, that Trey Construction Company retained at least some control over the bulldozer and the operator, and that the work being performed by the employee and the bulldozer was not the type work which was performed by Smackover Drilling Company. Under these circumstances we conclude that Young was not the borrowed servant, or employee pro hac vice, of Smackover at the time the accident occurred, but that he must be held to have been performing duties as the employee of Trey Construction Company at that time. In our opinion, the trial court did not err in holding that plaintiff is entitled to recover from defendants the damages which he sustained as a result of this accident.
The remaining issue presented relates to quantum. The trial judge awarded plaintiff the aggregate sum of $42,910.80, less the amount of workmen's compensation benefits paid to plaintiff up to the date of the trial ($4,999.63) and the amount of such benefits paid to him since that time. The judgment included an award of $35,000.00 for "pain, suffering and physical impairment," the sum of $7,660.80 as loss of wages to the date of the trial, and $250.00 as unpaid medical expenses which he has incurred. *127 Defendants contend that these awards are excessive. Plaintiff, on the other hand, has filed an answer to the appeal demanding that the award be increased to $100,000.00.
Plaintiff is 32 years of age. He is married and has two children, the older of the two being five years of age. He has an 11th grade education. After leaving high school he served in air force for about ten years, from 1951 to 1961. He then worked as a common laborer for a construction company for about one year, and he has worked as a roughneck in oil fields since 1962. Prior to the accident he was in good health and had no disabilities.
As a result of this accident plaintiff suffered: (1) A fracture-subluxation of the right ankle; (2) a comminuted fracture of the middle one-third of the right fibula; (3) a fracture, medial malleolus, of the left ankle; (4) a comminuted fracture of the left os calcis (heel bone); and (5) a lumbosacral sprain. After receiving emergency treatment he was referred to Dr. Carson R. Reed, an orthopedic surgeon, and he has been under the treatment of that doctor since that time. Dr. Reed performed surgery on his right ankle on the day of the accident, the surgery consisting of an open reduction and internal fixation of the fracture-subluxation. A Rush type pin was inserted fixing a major fragment of the medial malleolus to the tibia, and a plaster boot was applied. Hospitalization for 19 days was required for this treatment, and upon his discharge both legs were placed in plaster casts and he was confined to a wheel chair. The last cast was removed in April, 1965, and on May 13, he began walking on crutches.
On June 10, 1965, because of involvement on the subastraglar joint of the left foot, additional surgery was performed which consisted of fusing that joint with a bone graft taken from the left hip bone. The fusion of this joint caused plaintiff to sustain a permanent loss of inversion and eversion of the left foot. He was hospitalized about ten days in connection with this surgery, a plaster boot was again applied and he was supplied with a walking heel on July 22, 1965.
Thereafter he developed an abnormal boney growth on the heel and a moderate flexion contracture of the toes of the left foot, caused by the adhesion of the tendons to the heel bone. Surgery was performed on September 9, 1965, consisting of a tenolysis, which freed the tendons and permitted the toes to uncurl or to flex to some extent, and the removal of a three-fourths inch boney spur from the heel. Plaintiff was hospitalized four days for this surgery, and upon his release it was necessary for him to use crutches.
On February 11, 1966, due to crepitation, tenderness and increased pain in the right ankle, Dr. Reed performed surgery for the fourth time, which consisted of removing the previously inserted Rush pin. Hospitalization for three days was required for this surgical procedure. At that time Dr. Reed found that plaintiff had developed a mild traumatic arthritis of the right ankle, which he felt would continue to get worse and ultimately would necessitate a fusion of the right ankle bone to relieve the pain. He testified that if the right ankle was fused, plaintiff would lose about 75 percent of his dorsiflexion and plantar flexion of the foot, that is the ability to move it up or down. Such an operation would cost approximately $800.00.
Dr. Reed feels that plaintiff has a permanent residual disability of both feet and legs. He estimates that he will have 25 to 30 percent loss of use of the left lower leg, and 10 percent loss of use of the entire left leg as a result of the accident. Dr. Reed also feels that it will become necessary to fuse the right ankle joint, and if that is done he estimates that plaintiff will have a permanent residual disability of 25 percent of the lower right leg and 10 percent loss of the entire right leg. If plaintiff is able to avoid fusing the ankle, which appears to be unlikely, Dr. Reed estimates that he *128 would have about one-half as much disability of the right extremity.
Dr. Reed testified that in his opinion plaintiff would not be able to do any kind of work for at least six months after the trial, and that thereafter he would be limited to employment which would not require "extensive climbing or prolonged standing or tremendous weight bearing." He felt, however, that after a period of six months following the trial both of plaintiff's legs would be good, functional legs, and that he would be able to perform manual labor which did not require extensive climbing or prolonged walking or standing, such as driving trucks, tractors and automobiles and working in stores. He stated that he did not think "that in all probability his heel will ever be completely pain free on weight bearing." Plaintiff's condition, of course, is permanent and is the result of the accident.
After considering the nature of plaintiff's injuries, the severe pain which he has suffered and the pain which he will continue to suffer during the rest of his life, we have concluded that the award of $35,000.00 which was made by the trial judge for his pain and suffering, and for the permanent partial disability which he has sustained, is within the realm of the discretion which is vested in the trial court and we affirm that award. We also affirm the award made by the trial judge of $7,660.80, representing plaintiff's loss of earnings up to the date of the trial, and the award of $250.00 as unpaid medical expenses incurred by him.
We think the trial judge erred, however, in concluding that plaintiff has failed to show that he has sustained a loss of future earnings. The evidence shows that plaintiff, by training and experience, is qualified to perform only manual labor, consisting principally of working as a roughneck in an oil field. He is permanently disabled from working as a roughneck and from performing other types of manual labor which require extensive use of his legs and ankles. In our opinion he will be seriously handicapped in competing in the general labor market, although he will be able to perform some types of relatively light work.
At the time he was injured, he was earning about $115.20 per week, or approximately $6,000.00 per year. Assuming that he has a life expectancy of more than 36 years, as found by the trial judge, it appears that his total earning capacity should have been over $216,000.00.
We recognize that the amount which should be allowed as loss of future earnings cannot be computed on any scientific basis or fixed with any mathematical certainty. The most that the courts can do in such case is to exercise a sound judicial discretion and award such amount as, all the circumstances considered, may seem just to both litigants and not unduly oppressive to either. McFarland v. Illinois Central Railroad Company, 241 La. 15, 127 So.2d 183, 87 A.L.R.2d 246 (1961); Stevens v. Liberty Mutual Insurance Co., 133 So.2d 1 (La.App.1st Cir. 1960), affirmed 242 La. 1006, 141 So.2d 346 (1962); Stanford v. Bateman Frozen Foods Company, 149 So.2d 753 (La.App.1st Cir. 1963).
In the instant case we feel that plaintiff's permanent disability is of such a nature that he is entitled to a substantial award for loss of future wages. We think an award of $35,000.00 for loss of future wages would be fair and adequate.
No appeal was taken by plaintiff or by defendant Young, and on this appeal none of the parties are seeking to have the judgment amended or modified as between plaintiff and the non-appealing defendant, Young. The other defendants did appeal, however, and plaintiff has answered their appeal. The judgment can and will be amended, therefore, as between plaintiff and the appealing defendants.
For the reasons herein set out, the judgment appealed from is amended to increase the amount of the award made by the trial *129 court in favor of plaintiff and against the defendants Hardware Mutual Casualty Company and Robert E. Adair, Jr., d/b/a Trey Construction Company, from the sum of $42,910.80 to the sum of $77,910.80 (less $4,999.63 and all workmen's compensation paid to plaintiff since April 7, 1966), together with legal interest thereon from date of judicial demand until paid. In all other respects, including the award made by the trial court in favor of plaintiff and against the defendant Herbert Young, the judgment appealed from is affirmed. The costs of this appeal are assessed to defendants-appellants.
Amended and affirmed.