FRUGÉ, Judge.
Plaintiff, James A. Rider, brought suit against multiple defendants for damages arising out of personal injuries which he sustained in a fall from a tank. Prior to trial, several of the defendants were dismissed from the suit and the remaining defendants were Industrial Hardware & Supplies, Inc. (the retailer) and its insurer, Hartford Accident & Indemnity Company, and American Hoist & Derrick Company (the manufacturer). Defendants Industrial and Hartford brought a third party action against American Hoist. The principal issue against these three defendants was tried by a jury which returned a verdict against Industrial and Hartford in the amount of $60,000 and in favor of American Hoist, dismissing suit against the latter defendant.
The third party action, by agreement, was tried by the judge who rendered judgment in favor of American Hoist, rejecting the third party demand. Industrial and Hartford appealed, and plaintiff answered the appeal asking that damages be increased to $150,000.
The dispute centers around the adequacy of a safety latch assembly attached to a hook and metal cable, which plaintiff was using as a lifeline at the time of his fall. Plaintiff contends that Industrial sold the latch assembly manufactured by American Hoist, and that both represented it as designed for use in a safety belt assembly.
The accident occurred on April 5, 1963, while plaintiff was working as a painter for Hartman-Walsh on a painting project at the Continental Refinery in Westlake, Cal-casieu Parish, Louisiana. Plaintiff and a fellow employee were painting a ball tank, with the other man doing the actual painting from a bosun chair. The bosun chair was suspended from a dolly near the top of the tank. From time to time, the dolly was moved in order to swing the painter around the tank as he completed one area and moved to another. Plaintiff’s job was to remain at the top of the tank and roll the dolly when it became necessary to change the painter’s position.
Plaintiff was wearing a safety belt with a built-in metal ring. This ring was attached to a quarter-inch flexible metal cable which plaintiff was using as a lifeline. The cable had an eye on each end with a metal hook permanently attached to each eye. On each hook was attached a safety latch. Plaintiff contends that this safety latch was not safe for its designed purpose. One of the hooks was attached to plaintiff’s safety belt and the other was wrapped around one of the uprights supporting the circular railing at the top of the tank and attached to the cable. Plaintiff supported himself by this cable and safety belt when he walked around the slope of the tank to move the dolly. About the fifth time plaintiff made this maneuver, the hook became detached from the line, releasing the connection to the tank railing. Plaintiff fell to the ground, feet first, some 50 feet below, severely injuring himself.
Plaintiff brought suit against American Hoist, Industrial, and Hartford Insurance Company, Industrial’s insurer, basing his suit on the allegation that the “safety latch” in question was manufactured by American Hoist, who in turn distributed the same to Industrial, who in turn sold the same to Hartman-Walsh, employer of the plaintiff, for the latter’s ultimate use in a safety belt assembly.
Plaintiff showed without contradiction at trial that his fall from the tank on which he was working resulted from the fact that the safety latch on his safety belt assembly *63 opened unexpectedly in ordinary use. The manner in which the latch could so open and cause plaintiff to fall was discovered by a witness on the job soon after the accident occurred, and was clearly and effectively demonstrated.
John Aucoin was plaintiff’s foreman on the Westlake Refinery job where the accident occurred. He testified that the headquarters of plaintiff’s employer, Hartman-Walsh, was in Baton Rouge, as was Industrial’s store. Tr. 576. He and another employee brought the equipment for the Westlake project from Baton Rouge to Westlake in the employer’s truck. When they were preparing to leave, he and another employee loaded the equipment on the truck and, upon going through a checklist, discovered that there was no safety belt as required. He and another employee thereupon went to Industrial Supplies’ store, the employer’s usual supplier, where the safety belt assembly in question was bought. Mr. Aucoin testified:
“Q. Now, you testified that you and Mr. Bankston took a truck and went to Industrial Hardware & Supplies, Inc., is that correct?
“A. Mr. Bankston was sent up there to get it and I rode with him.
“Q. Who sent Mr. Bankston up there?
“A. I don’t know.
“Q. Who gave him the orders to go ?
“A. He got it from inside the shop. He said he had to go to the Hardware and wanted to know if I’d take a ride with him and I said yes.
“Q. Mr. Bankston ásked you if you would like to go with him?
“A. Yes.
“Q. When you got to Industrial, did Mr. Bankston go inside?
“A. Yes, sir.
“Q. Did you go inside?
“A. No, sir.
“Q. When Mr. Bankston came out, did you ask him what he had purchased in there?
“A. He had two small boxes and that belt.
“Q. He had two small boxes, did you say?
“A. Yes, sir.
“Q. You didn’t see what was in those boxes at the time, did you, sir?
“A. No, sir.
“Q. Did he have anything other than those two small boxes?
“A. That safety belt.
“Q. You saw the belt when he came out of Industrial Hardware & Supplies ?
“A. Yes, sir.
“Q. Are you talking about jpst the webbing, the belt part, or áre you talking about the cable that was attached—
“A. The whole — the rig.
“Q. You. actually saw that ?
“A. Yes, sir.” (Tr. 593)
The safety belt assembly was taken from the store to the equipment truck. It was loaded on the equipment truck, and that item was scratched off the checklist. The truck was then driven immediately to the job site. The belt assembly was placed in the equipment shed on the job site and, later, taken from .there to the tank from which plaintiff fell after using the belt about an hour or so. This was the first time the safety belt assembly was used.
In contradiction of the testimony of Mr. Aucoin, defendant offered the testimony of Mr. Simmett Bankston, the man whom Mr. Aucoin testified he had accompanied to Industrial Hardware’s store. Asked *64 whether he had made the purchase, Mr. Bankston replied:
“A. To my knowledge, no, sir.”
Pressed for a more positive reply, Mr. Bankston testified:
“Q. If you had done it, do you think you would know about it?
“A. I would. I mean, I think I would. I’m not certain. This was six years ago, but I don’t right off the top of my head ever remember purchasing an apparatus completely as you have it here.” (Tr. 720)
Bankston further testified that no one at Industrial Hardware & Supplies ever represented to him that such a rig as the one involved here was suitable for purposes of a safety belt.
It is conceded that this particular safety belt and lifeline assembly is unsafe and should not have been used. The only issue, then, in the case is whether Industrial Hardware sold the lifeline assembly to plaintiff’s employer for use as a lifeline. This is a purely factual question, the resolution of which depends largely upon the credibility of the witnesses.
After weighing the evidence, the testimony, and the credibility of the witnesses, the jury apparently concluded that an employee of Industrial Hardware & Supplies, Inc., did sell the safety belt equipment to an employee of Hartman-Walsh for use as a safety belt. There is sufficient testimony and evidence, which the jury had a right to believe, to support its finding of fact. We cannot say, then, that the jury erred in resolving this factual issue.
Defendant has argued before the trial court and before this court the defenses of contributory negligence and assumption of risk. Defendant argues that since plaintiff testified he had never used the safety lines made of quarter-inch cable before, but had always used a fabric rope, that the plaintiff was contributorily negligent in failing to inspect the safety belt and line. Defendant further argued that plaintiff’s use of this device constituted assumption of the risk on his part.
Mr. Rider testified that he had always used a fabric rope before and had never used a steel cable. He also testified that this setup appeared to him to be safer than tieing a fabric rope. We cannot say that the plaintiff was contributorily negligent in using this safety device, or that he should have realized the danger involved in this safety device before he used it. The safety belt assembly is not a makeshift, improvised device, which in appearance would lead one to anticipate that it is inadequate or that it would malfunction. In appearance, it is a well constructed, carefully designed piece of modern equipment to which one might confidently entrust his life. We cannot say that the jury erred in not finding the plaintiff con-tributorily negligent in using this piece of safety equipment.
Defendant argues before this court that since the jury found liability on the part of Industrial Hardware & Supplies, Inc., and exonerated the manufacturer, American Hoist & Derrick Company, that the jury verdict is inconsistent and must be set aside. On trial of the case, however, both defendants made written requests for charges to the jury to the effect that it did not necessarily follow from the fact that there were two defendants in the action—that if one is liable, both are liable. The judge so charged the jury.
Defendant Hartford, insurer of Industrial, now argues before this court that if the seller was negligent, then it is manifestly obvious the manufacturer was also negligent. The jury’s verdict is not inconsistent in light of the charges given *65 to the jury at the request of both defendants.
On the question of quantum, we think that the case of Kezerle v. Hardware Mutual Casualty Co., 198 So.2d 119 (La.App.3d Cir. 1967) is most similar to the instant case. In that case, a 32-year-old plaintiff suffered permanent residual disability of both feet and legs as a result of a fall from a derrick on which he was working. This court, with Judge Hood as its organ, awarded the plaintiff an additional $35,000 for loss of future wages above the $42,910.80 awarded by the trial court. The award was increased because the trial court failed to include loss of future wages in the award. The accident involved in that case, as well as the injuries, treatment, and resultant disability, are all similar to the instant case.
In the instant case, the plaintiff Rider was 33 years old at the time of the accident. Because of the injuries sustained and the treatment, including fusion of the heel and ankle, he is seriously handicapped in his ability to compete in the labor market and is permanently disabled from doing hard manual labor. The amount awarded to the plaintiff is neither manifestly excessive nor manifestly insufficient, in light of all the circumstances in the instant case.
For the above and foregoing reasons, the judgment of the trial court is affirmed; all costs to be paid by defendants-appellants.
Affirmed.