281 So.2d 874 (1973)
Mrs. Juanita Hamilton AMUNSON, Individually, and for the Use and Benefit of her minor child, Stephen Carl Amunson, Plaintiff-Appellant,
v.
WYATT INDUSTRIES, INC., et al., Defendants-Appellees.
No. 9286.
Court of Appeal of Louisiana, First Circuit.
June 29, 1973.
Rehearing Denied August 23, 1973.
H. Alva Brumfield, L. C. Parker, Baton Rouge, and John J. Cummings, III, New Orleans, for plaintiff-appellant.
E. L. Richardson, Baton Rouge, for Robert Manning, Edmond Kornegay, Chas. Eckstrom, Troy Wilson and Alvin Wilson.
Robert J. Vandaworker, Baton Rouge, for Wyatt Industries, Superior Ins. Co., George M. O'Leary and John A. Wilson.
Donald T. W. Phelps, Baton Rouge, for Conn. Fire.
Tom Alexander, Houston, Tex., for Lloyd.
Calvin E. Hardin, Jr., Baton Rouge, for Humble.
Robert Kleinpeter, Baton Rouge, for Am. Hoist.
Before SARTAIN, BLANCHE and WATSON, JJ.
SARTAIN, Judge.
This is the first of four consolidated cases growing out of an industrial accident which occurred on the morning of June 24, 1966, at the Humble Oil and Refining Company's plant in Baton Rouge, Louisiana. Carl Amunson, Jerry Davis and Cecil Roland were killed as a result of the accident. Dean B. England survived the accident but sustained serious permanent and crippling injuries.
The widows of the decedents and the court-appointed representatives of the minors filed suits for wrongful deaths, and Dean B. England filed suit in tort for the injuries he sustained. In the England and Roland suits some twenty-seven individuals, corporations, and liability insurers were named as defendants. In the Davis and Amunson suits five additional defendants were named. These defendants included, inter alia, numerous corporations and their liability insurers, together with individuals alleged to have acted negligently, thus contributing to the accident.
*875 The plaintiffs have appealed from the judgment of the district court in each of these cases absolving all of the defendants of liability except W. B. Rayburn. Mr. Rayburn has not appealed nor answered the appeal so the judgment against him is final.
The instant suit was initiated by Mrs. Amunson, individually, and for the use and benefit of her minor child, Stephen Carl Amunson, and bears number 120,971 on the docket of the 19th Judicial District Court. The remaining suits are Mrs. Kay Lynn Davis, Individually, Etc. vs. Wyatt Industries, Inc., et al., 19th Judicial District Court docket number 120,972 and our docket number 9287; Juanita Mae Roland, Individually, Etc. vs. American Hoist & Derrick Co., et al., 19th Judicial District Court docket number 120,973 and our docket number 9288; and, Dean B. England vs. American Hoist & Derrick Co. et al., 19th Judicial District Court docket number 120,974 and our docket number 9289.
The district court, with detailed written reasons, found that the sole and proximate cause of the accident was due to the negligence of one defendant, namely, W. B. Rayburn. Judgment was rendered dismissing plaintiffs' claims against all other defendants and against Mr. Rayburn as follows: In the Amunson suit in the sum of $264,792.14; in the Davis suit in the sum of $279,638.02; in the Roland suit in the sum of $344,000.00; and in the England suit in the sum of $102,966.08, all together with legal interest thereon from date of judicial demand until paid. Plaintiffs have appealed and we affirm.
On December 8, 1964, Humble Oil Company executed a contract with Wyatt Industries, Inc. wherein the latter was to provide for the fabrication and installation of a fractionator tower at Humble's plant. The contract provided for field erection work to be performed by Steel Tank Construction Company, Inc., Wyatt's wholly owned subsidiary.
We adopt with approval the District Judge's description of the equipment used, the events leading up to the accident, his findings of fact and conclusions of law:
"The tower was built on a base from the ground up. This necessitated the movement of men and material from ground level to whatever level was being worked on at a particular time. In order to accomplish the movement and lifting of men and material Steel Tank purchased a second-hand stiff-legged derrick and electric draw works.
"There were two devices used to lift men and materials. The first was a single strand line, hereafter called the `whipline' that ran from a drum on the draw works to the stiff-legged derrick where it turned on a pulley traveling upwards some 240 feet to the end of the derrick and again turning on a pulley out to the end of the boom and over to a final pulley and then directly back down to the ground where it was attached to a headache ball and hook. This line was used whenever a quick lift was required. Usually it was used for lifting light material and personnel.
"The second device for lifting was referred to as the `loadline'. This line was a multi-stand line operating basically the same as the whipline from the drawer works upward to the tip of the boom on the top of the derrick. This line ran through a block of pulleys with anywhere from four to seven lines. At the bottom of the second set of pulleys was another headache ball and hook. This line was able to lift the bulk of the heavy steel and pipe used in the construction of the tower.
"On the morning of the accident the decedents, England and three others loaded their tools and equipment into the `basket' and prepared for the ascent to the top of the tower to do their day's work. The drawer works operator, Leonard Delaney, was at least 75 yards from the tower and because of the position *876 of the boom the `basket' itself and whipline were completely out of his sight. He relied on signals from two men, W. D. Rayburn and Butch Noack. Rayburn was standing on the ground positioned where he could see both the basket and the drawer works operator. He gave a signal and Delaney lifted the `basket'. After some initial confusion the `basket' was carried for several hundred feet to the top of the tower itself. At that time a boom-up signal was given by Butch Noack, the flagman on top, so that the `basket' could be lifted up over the top of the tower and then lowered to permit the men and materials to unload. It was at this stage that tragedy set in because after the boom-up signal was given metal started screeching, the boom fell and the `basket' itself fell until it hit the ground carrying Amunson, Davis and Roland to their deaths and seriously injuring England. Fortunately, the other three men were able to jump from the `basket' to the scaffolding and the loadline.
"Both Rayburn and Noack gave signals to Delaney during the entire operation but Delaney said he relied more on Noack's signals because of his position at the top of the tower. Additionally, Noack had an ear phone system from the top of the tower directly to Delaney. Apparently Noack and Rayburn both gave Delaney the boom-up signal. Delaney testified in his deposition that after he boomed-up he knew something was awry because the drum began to slow. It was at that time he knew something was wrong. He waited for another signal but none came and about that time the whipline began to come off the cable. The line just gave way. It was at this point that Delaney left the drawer works and ran over to Tory Wilson, the foreman. Wilson told him to go back to the drawer works to do what he could but by the time Delaney got back to the drawer works the `basket' was on the ground.
"The Court feels that this brief narration adequately describes the factual situation surrounding this tragedy. It is not completely detailed but the important facts have been set forth.
"Everyone connected with the case, including the Court, and the plaintiffs, feels that there was overwhelming evidence that at the time of the boom-up attempt the loadline headache ball was attached to a concrete base as can be seen in the photograph P-32. A cable choker was looped around a nut at the top of the base as can be seen in said photograph. After the whipline carried the `basket' to the top of the tower in order to swing the `basket' into the tower it was necessary for the boom to be lifted skyward. This caused the basket to drift inward. The loadline attached to the top of the boom at one end and to the concrete base at the other in effect became an immovable object because after its slack was completely taken up the drawer works derrick and boom was called upon not only to lift the whipline and its load but also the immovable concrete base at the bottom of the tower itself.
"The evidence is completely silent as to who tied the loadline to the concrete base. It could have been anyone at the scene including the decedents and/or England. Regardless, the condition went undetected by everyone including the signalman and the drawer works operator.
"The Court must decide if the above occurrence was the result of negligence and if so upon whose shoulders liability should be placed. The deaths of Amunson, Davis and Roland and the injuries to England occurred in the ordinary course of their employment as employees of Steel Tank, which employment was hazardous within the intendment of the Workmen's Compensation Law of Louisiana. The exclusive remedy of the plaintiffs in this case as to Steel Tank, Wyatt and their compensation and liability *877 insurer was for benefits under the Workmen's Compensation Act. If plaintiffs are to recover damages in addition to Workmen's Compensation benefits which have already been paid negligence against parties other than Steel Tank, Wyatt and their insurer must be established.
"After examining in detail the voluminous record filed herein, including all of the depositions, the Court's extensive trial notes and the briefs filed by all parties the Court is constrained to say that plaintiffs have failed to establish by a preponderance of evidence any independent negligence on the part of anyone other than employees of Steel Tank. The Court feels that this most tragic and unfortunate accident occurred as a result of human error because someone tied the loadline choker cable to the concrete base. This was the sole and only proximate cause of the accident in question.
"None of the executive officers can in this Court's opinion, be held accountable for what happened on the morning of this accident. The closest that plaintiffs can come to establishing negligence on the part of anyone other than the unidentified man or men who attached the line to the base and possibly those who failed to notice that it had been so attached are Charlie Eckstrom and Troy Wilson. The Court will discuss purported negligence of these two individuals separately.
"Insofar as Charlie Eckstrom, safety engineer for Wyatt and Steel Tank, is concerned the court feels that the most elaborately planned safety techniques that could be envisioned by the foremost experts in safety engineering could not have prevented this accident. An elementary law of physics was being defied, and no amount of safety engineering could have altered what happened after the wheels were set in motion.
"Troy Wilson was foreman on the job. Troy Wilson testified that just prior to the accident he saw the loadline and headache ball suspended almost at ground level and that while preparation for the ascent continued he left and went to his office and that he was in his office when the accident happened. When he heard the noise and confusion generated by the failure of the boom and lines he rushed out to the scene of the accident and found that the loadline headache ball had been attached to the concrete base. Someone attached the headache ball after Mr. Wilson went into his office.
"The deposition of Edmond Kornegay is significant inasmuch as Kornegay said that he used the loadline on the way up as a tag line. The conclusion is almost inescapable that someone in the material basket fastened the choker cable to the concrete base in order to facilitate the ascent to the top of the tower by using the loadline as a tag on the way up. Troy Wilson testified at the trial and said that his first operation on the morning in question was to go up and get the loadline and bring it down for a lift. He said, `I saw it come down, Your Honor. I walked around the vessel and saw them bring it down and they went up and got it and brought the load block down, brought it down to the position of head height or ten feet, or somewhere in this area with a block, which you have three or four balls and all of it together is about eight feet long. At that time, we had each piece up. They brought the buzz down and I stood there and watched them. They loaded the personnel to go up. I watched them load the men and everything appeared ordinary. I left and walked around the vessel and came back by the operator and he was still waiting to load and everything appeared normal. He had started up and was carrying the men up as I came by and everything was ordinary...."
"The Court feels that none of the individual defendants named, George O'Leary, John A. Wilson, Troy Franklin Wilson, Charles Eckstrom, Alvin M. *878 Wilson, Robert Blackburn Manning or Edmond Kornegay were guilty of any negligence which caused or contributed to this accident. Accordingly, the Court must make the following findings of fact; (1) only employees of Steel Tank were engaged in the construction project at the time of the accident sued on; (2) the accident sued on resulted from the act of an employee or employees of Steel Tank in securing the loadline to the stationary concrete base; (3) no officer of Steel Tank was present at the job site immediately prior to or at the time of the accident, nor did any employee with supervisory duties have knowledge or have reason to have knowledge of the act of an employee or employees of Steel Tank securing the said loanline. The Court feels that the plaintiffs have established that one or more Steel Tank employees caused this accident. The injured, Dean England, and the deceased were all employees of Steel Tank and have received their Workmen's Compensation Benefits in accordance with law.
"Rayburn, a Steel Tank employee gave the boom-up signal after the basket neared the top and Delaney stopped the whipline and started the boom drum. Without such a signal from Rayburn and Noack he would not have raised the boom and it was then that the trouble started. Rayburn was in a position to see that the loadline was tied off and his failure to see the same may have been a proximate cause of this accident. Additionally Leonard Delaney may have been negligent in leaving the drawer works immediately after the collapse of the boom because the brake on the whipline was not set when Troy Wilson examined it immediately after the accident and there was nothing wrong with the brake or the rest of the drawer works but any negligence on Delaney's part was after the fact. Plaintiffs failed to call either Noack or Rayburn for testimony on deposition or at trial. The Court will not speculate as to what their testimony may have revealed, but feels that whatever it may have been it would have been of no significance because the record shows that on the morning in question only employees of Steel Tank were present and they only could have secured the loadline to the concrete base.
"The Court feels that nothing was wrong with the equipment, nothing was wrong with the communication system, nothing was wrong with the operator prior to the accident and that this accident resulted through the negligent act of an unknown co-employee or employees.
"The only remaining defendant is the American Hoist and Derrick Company who manufactured the stiff-leg and derrick. There was absolutely no evidence presented of any kind to show actionable negligence against the American Hoist and Derrick Company. For all the above reasons there must be judgment in favor of all defendants with the exception of W. D. Rayburn. If plaintiffs desire to proceed further against Rayburn appropriate default proceedings may be taken."
Appellants contend that the trial judge erred in holding that Rayburn was solely responsible for the accident. It is their contention that the lifting procedure and equipment were unsafe and faulty. It is further urged that this was a breach of Wyatt's contractual obligation to Humble and contrary to the provisions of R.S. 40:1672[1] and 1682.[2]
*879 Appellants further assert that the officers of Wyatt and Steel Tank charged with safety responsibilities negligently failed to provide measures which would have avoided this tragedy.
First, the record is devoid of any creditable evidence to support the finding that the equipment itself was defective or unsafe.
Second, the record convinces us, as it did the trial judge, that the failure and ultimate collapse of the stiff-legged derrick was due to the fact that the load line was tied to a concrete base. The base did not give under pressure from the lifting of the boom, so the derrick itself failed.
Third, under circumstances similar to these, it is standard procedure for the operator (Delaney) to raise or lower the various lines on signal from either the flagman on the ground (Rayburn) or on the voice command of a flagman (Noack) who was on top of the tower. Delaney did not attempt the boom up operation until he was told to do so. The communication system employed here, i. e., hand signals from the ground flagman to the draw works operator and wire communication from the top of the tower to the draw works operator does not violate the provisions of the cited statutes. The load was at all times within the view of one or the other and the draw works operator was not and did not make a move until he had received an appropriate signal.
Fourth, the lifting operation took from five to seven minutes. It is abundantly clear that after the men were settled in the personnel basket and before they reached the top of the tower, someone tied the load line to the concrete base. It was Rayburn's responsibility to see that this was not done. The evidence is uniform on the point that when this particular lifting operation commenced the load line was in a safe position with its end elevated six to eight feet from the ground.
Fifth, the lifting procedure endeavored here was repeated many times before the accident. The whipline had been used as many as fifty times on a given day.
Sixth, Delaney was not an incompetent operator. He was an experienced journeyman operator who had received instructions for one week prior to assuming the task of operating the drawer works involved here and had performed this work daily for three weeks prior to the accident.
Accordingly, for the above and foregoing reasons, the judgment of the District Court is affirmed and the cost of this appeal is to be pro-rated among the plaintiffs in these consolidated cases.
Affirmed.
NOTES
[1] § 1672. Scaffolds, supports, or other mechanical contrivances

All scaffolds, hoist cranes, stays, ladders, supports, or other mechanical contrivances erected by any person for use in the erection, repairing, alteration, removing, or painting of any building, bridge, viaduct, or other structure shall be constructed, placed, and operated so as to give proper and adequate protection to any person employed or engaged thereon or passing under or by it, and in such a manner as to prevent the failing of any material that may be used or deposited thereon.
[2] § 1682. Communication system for mechanical elevating machines or hoisting apparatus used in construction work If elevating machines or hoisting apparatus, operated or controlled by other than hand power, are used in the construction, alteration, or removal of any structure, the owner, contractor, or sub-contractor shall, during the use and operation of the elevating machine or hoisting apparatus, provide and maintain an adequate system of communication by signals, so that prompt and perfect communication may be had at all times between the operator of the engine or motive power of the elevating machine or hoisting apparatus and the employees or persons engaged thereon or using or operating it. The officers of the city charged with the enforcement of the building laws shall enforce this Section. If such officers fail to do so, the police authorities shall, pursuant to the terms of this Part, enforce the provisions of this Section.