328 So.2d 779 (1976)
HIGHLANDS INSURANCE COMPANY, Intervenor-Appellant,
v.
L. J. DENNY AND SON and State Automobile Insurance Association, Defendants-Appellees.
No. 5351.
Court of Appeal of Louisiana, Third Circuit.
March 10, 1976.
Rehearing Denied April 7, 1976.
Writ Refused June 2, 1976.
*781 Davenport, Files & Kelly by William G. Kelly, Jr., Monroe, for defendant-intervenor-appellant.
Theus, Grisham, Davis & Leigh by Charles H. Heck, Monroe, for defendants-appellees.
Before HOOD, GUIDRY and PETERS, JJ.
HOOD, Judge.
Billy Miller, an employee of Computerized Natural Resources (CNR), instituted this suit for damages for personal injuries sustained by him while he was assisting in dismantling and moving an oil rig. The defendants are L. J. Denny and Son Trucking Company and its insurer, State Automobile Insurance Association. Highlands Insurance Company, the workmen's compensation insurer of CNR, intervened seeking to recover from defendants the compensation payments it made to Miller.
Miller entered into a compromise settlement with defendants while the suit was pending, and pursuant to that settlement judgment was rendered dismissing his demands against defendants, but reserving to Highlands the right to prosecute its claim against defendants for reimbursement of the compensation benefits it paid to Miller.
After trial, the trial judge concluded that the employees of Denny Trucking Company were not negligent, and he accordingly rendered judgment in favor of defendants, rejecting Highlands' demands and dismissing its intervention. Highlands appealed.
The issues presented are: (1) Were employees of the Denny Trucking Company negligent? (2) Was plaintiff Miller or any other employee of CNR negligent, and if so, does that negligence bar intervenor, CNR's insurer, from recovering from defendants the amount of workmen's compensation benefits intervenor paid to Miller? (3) Were the driver and swamper on the Denny *782 Trucking Company winch truck employees "pro hac vice" of CNR at the time of the accident, with the result that the general employer, Denny, was not responsible for the negligent acts of those employees?
On December 16, 1969, Billy Miller was working for CNR as a member of a drilling crew on one of its oil rigs in Concordia Parish. CNR at that time was in the process of dismantling that rig and moving it to a location in Mississippi. It had engaged L. J. Denny and Son Trucking Company, a partnership composed of L. J. Denny and J. R. Denny, to haul the rig to the new location. While a part of the rig was being lifted and moved so that it could be loaded on a truck, a chain caught on the substructure of the rig, causing the substructure to overturn. Plaintiff Miller was injured as a result of that accident.
Several of Denny's trucks were being used to load and to move the rig. Most of the trucks were equipped to haul heavy loads, and those vehicles were used to do the actual hauling. One of the trucks, however, was a "winch truck," equipped with three winches and a set of gin poles. That truck was used solely to lift and move parts of the rig as the latter was being dismantled, and to either load those pieces of equipment on the trucks which did the hauling or put them in places where they could be easily loaded on trucks later.
Each truck used by the Denny Company in performing the work was operated by a driver employed by that company, and in some instances a helper or swamper also was assigned to a truck. The above winch truck was operated by a driver and a swamper. Thomas George was the driver of the winch truck, and he also was the "truck pusher" for Denny at the time the accident occurred. As truck pusher, George was in charge of all of the drivers and of all of the trucks being used by Denny on that job. Tom Branch was working as the swamper on the winch truck. His duties as swamper, among other things, were to handle the line of the winch truck, to tie that line onto loads which were to be lifted and moved, to give signals to the truck driver when the load was ready to be lifted or moved, and to take the winch line loose from the load after it had been deposited in its proper place. Both of these employees, George and Branch, were experienced in the work they were performing, and both of them were regular employees of the Denny Company.
Most of the drilling rig, including the derrick, had been dismantled and had been hauled away by the time the accident involved here occurred. Only the substructure of the rig and some appurtenances to it remained in place. Several employees of CNR, including Miller, were on the floor of the substructure and were engaged in dismantling the rig. The CNR crew removed pins from the dividers which held the substructure in place shortly before the accident occurred.
The evidence indicates that the CNR employees used a section of chain with at least two hooks on it to make a bridle around a heavy piece of equipment which was to be moved. The winch line or cable from the gin pole on the truck was then fastened to that bridle. After the winch line had been hooked to the bridle, the driver of the truck caused the rig section to be raised several feet above the ground. It became apparent as soon as the load was raised that a length of chain, from five to eight feet long with a hook on the end of it, was left hanging loose below the piece of equipment which was being moved. This length of chain was a part of the bridle which had been made for or looped around the equipment.
After the above piece of equipment had been raised above the rig floor, the driver of the winch truck caused that vehicle to begin to move forward with its load suspended by a cable from the end of the gin pole in the back of the truck. The ground was muddy, however, and that caused the wheels of the truck to spin and that vehicle to sink deeper in the mud. When the *783 wheels of the truck gained traction, the vehicle suddenly began to move forward, and as it did so the length of chain which was hanging from the load caught on a part of the substructure of the rig and the truck pulled the substructure over. The truck travelled a distance of from ten to twenty feet before the chain caught on the substructure and turned it over. Plaintiff Miller was on the substructure at that time, and he was injured as a result of the accident.
Intervenor contends that the sole cause of the accident was the negligence of defendants' driver, George, in driving that truck forward when it was unsafe to do so, that is while a length of chain was hanging from the load it was moving, and in failing to maintain a proper lookout as the truck began moving to make sure that the hook on the chain cleared the substructure.
Defendants contend that the sole cause of the accident was the negligence of CNR employees (1) in failing to tie the bridle chain properly to the load which was being lifted, and particularly in allowing a part of that chain to hang while the load was being moved; (2) in signalling to the driver of the truck that it was safe for that vehicle to be moved forward; and (3) in removing the locking pins from the dividers of the substructure floor before the other dismantled equipment had been moved from the rig site.
The driver and the swamper on the winch truck were aware of the fact that a length of chain with a hook on the end of it was dangling from the load as it was being lifted and moved from the rig site. Both realized that there was a danger that the hook would catch on the substructure as the truck was being moved, and that damages or injuries might result if that occurred.
George testified that he saw the chain with a hook on the end of it dangling under the load before he began moving the truck. He said that he asked someone on the floor of the substructure if it was "high enough" to clear that structure, and that a CNR employee thereafter gave him a hand signal to go ahead. He stated that Branch, his swamper, was standing on the ground beside the cab of the truck, that Branch saw the chain hanging down, and that Branch also signalled for George to drive forward after Branch saw someone on the rig give a similar signal. George admitted that he customarily would not allow a chain to hang down from a load as it was being lifted and moved with a winch truck, because of the danger that the chain would catch on something. He testified that he knew that there was a possibility that the hook on the chain would catch on the substructure in this instance when he moved the truck forward. After the above signal was given to him, he began to move the truck forward and he did not look back again until after the accident occurred.
Branch testified that he was standing near the rear of the truck, and that he saw the chain dangling when the load was first lifted from the floor of the substructure. He knew that it was dangerous to move the truck while the chain was hanging down, and he says he told the men working on the floor of the substructure that "they'd better hook that chain back up." He testified, however, that he said nothing to George, the driver of the truck, about it, and he denies that he gave George a signal to move forward with the truck.
The evidence is conflicting as to whether the bridle or hookup for the equipment which was being moved was made by CNR employees or by employees of the Denny company. We are convinced that it was made by CNR employees. George and Branch were the operators of the winch truck, however, they were experts in lifting and moving heavy equipment, and they were employees of the Denny Company. Both of them observed the manner in which the hookup was made, and both saw the chain dangling from the load before the truck was moved. George acknowledges *784 that it was dangerous to move the load under those circumstances, but he proceeded to move it in spite of that known danger. as "truck pusher," he had complete control of the manner in which the winch truck was operated, and he had the right to require that the chain be hooked up as was customary before he proceeded to move the truck. Branch also was aware of the danger. He was in full view of the truck driver at all times, and he could have told or signalled to George that the movement of the truck should be delayed until the end of the chain was hooked up or changed so as to remove the apparent danger.
The fact that an employee of CNR motioned to George indicating that it was safe for him to move the winch truck forward after picking up the load does not excuse George's negligence or relieve defendants from liability. In that connection we distinguish from the instant suit the case of Amunson v. Wyatt Industries, Inc., 281 So.2d 874 (La.App. 1 Cir. 1973), cited by defendants as authority for their argument that George was entitled to rely on the signals given to him by someone on the floor of the substructure. In Amunson the operator of the draw works which was used to lift employees to the top of a tower was required to be in such a position that the basket and the whipline, constituting parts of the lifting device, were completely out of his sight, and it was necessary for him to rely on signals from other employees before engaging the draw works. He had no knowledge of the danger, and he thus was found to be not negligent. In the instant suit, the danger was obvious to George before he began moving the truck, he was the expert in charge of moving the rig, he could see the dangling chain and the substructure, he did not have to rely on signals from anyone else insofar as that particular danger was concerned, and he proceeded to drive his truck forward although he knew that damage or injury might result from his action in doing so.
The evidence convinces us that defendant Denny's employee, George, was negligent in causing the winch truck to move forward when he knew that it was unsafe to do so, in failing to maintain a proper lookout while the truck was moving and in failing to bring it to a stop after the chain hooked on the substructure and before that part of the rig was overturned. His negligence in that respect was a proximate cause of the accident.
Defendants contend, however, that intervenor is barred from recovering in this action by the contributory negligence of plaintiff Miller and the employees of CNR. They argue primarily that Miller was negligent in assisting in the removal of the interlocking pins on the divider of the substructure before all other parts of the rig had been moved away from the site, and that his contributory negligence alone bars intervenor from recovering.
The evidence indicates that the substructure would not have overturned if the pins had been in place at the time the accident occurred. Miller concedes that he assisted in removing those pins before he was injured.
Miller was employed to work as a roughneck on the rig, and there is nothing in the record indicating that he departed from his regular assigned duties in removing those pins. He was under the direct control of the tool pusher and the driller for CNR, both of whom were present on the job. We assume that he was directed by his superiors to remove the pins, and the evidence does not show that he performed that job negligently or improperly.
We conclude that Miller was not negligent, in assisting in the removal of the pins before the accident occurred. Having reached that conclusion, it is unnecessary for us to consider the legal question of whether negligence on his part would have barred recovery by intervenor.
*785 Defendants argue further that CNR, intervenor's insured, was chargeable with contributory negligence for permitting the premature removal of the interlocking pins before all other parts of the rig had been removed, and that its negligence in that respect bars intervenor from recovering in this case.
Our law is settled that the negligence of an employer does not bar his right to recover from a negligent third party tort feasor the amount of compensation benefits which the employer paid to an injured employee. Vidrine v. Michigan Millers Mutual Insurance Company, 263 La. 300, 268 So.2d 233 (1972); Badeaux v. Patterson Truck Line, Inc., 247 So.2d 875 (La.App. 3 Cir. 1971); See also LeJeune v. Highlands Insurance Company, 287 So.2d 531 (La.App. 3 Cir. 1973).
Defendants argue that Vidrine, supra, is not applicable here, because in that case the employer was only "vicariously liable," while in the instant suit CNR is chargeable with "personal rather than imputed negligence." They contend that CNR was "grossly derelict in permitting" the removal of the pins before all of the other parts of the rig had been removed, and in establishing a "procedure on the job" of removing the interlocking pins prematurely while rigs were being dismantled. Their argument is that this personal contributory negligence on the part of CNR, as distinguished from imputed negligence, bars CNR's insurer from recovering.
We find nothing in the evidence which tends to establish that CNR established a "procedure on the job" of removing interlocking pins at any particular time. There also is nothing in the evidence tending to show that CNR, as a legal entity, permitted the removal of the pins. We assume that its employees authorized that part of the work to be done, but we are unable to distinguish this case from Vidrine, supra, insofar as the right of the employer to reimbursement is concerned.
In Vidrine, supra, our Supreme Court, after referring to LSA-R.S. 23:1101 and 1103, said:
"In neither of the above quoted sections is there any suggestion that the right to recover compensation actually paid or due is limited to those employers who are blameless, or innocent of any action which might have caused the injury. Furthermore, nothing in the sections creates a classification of employers into those who are at fault and those who are not. Any attempt by this Court to create such a classification would amount to judicial statutory amendment."
Assuming for the purposes of this suit that CNR was negligent, and that its negligence was personal rather than imputed, we nevertheless find that its negligence, regardless of how it may be classified, does not bar it or its insurer, Highlands Insurance Company, from recovering from defendants the amount of workmen's compensation benefits intervenor paid to Miller.
Defendants contend, finally, that the driver and the swamper on the winch truck were employees "pro hac vice" or "borrowed servants" of CNR at the time of the accident. They argue that since George and Branch were borrowed servants of CNR, defendants are not responsible for their acts and thus they are not liable to intervenor for the amounts claimed in this suit.
The evidence shows that the Denny Company was engaged in the business of moving oil well rigs. The moving of the rigs included the loading of sections or parts of the rig on trucks as the rig was being dismantled.
The agreement between CNR and Denny was that the latter would provide the necessary trucks, drivers and swampers to complete these loading, hauling and unloading *786 operations. CNR agreed to pay the Denny Company a stipulated rate for the hauling done by that company, according to the weight of the load carried and the distance traveled by each truck which did some hauling. It also agreed to pay Denny a stipulated sum per hour for the work done by the winch truck which was used in the loading and unloading operations. One of defendants' witnesses explained that since the winch truck was not equipped to do any hauling, a different rate had to be charged for the use of that truck.
All of the drivers and swampers furnished by the Denny Company, including George and Branch, were general employees of Denny and they were compensated by Denny. CNR made no payments to those employees.
J. R. Denny, one of the partners in the Denny Company, testified that the drilling superintendent for CNR engaged the Denny Trucking Company to move the rig from its location in Concordia Parish, Louisiana to a point in Mississippi. He stated that he agreed to perform that work for the standard rates which are regulated by the State and Federal Governments, and that he submitted one bill to CNR at the conclusion of the job in which he itemized all of his charges for that work. He testified that he hires his own employees, that he hired George and Branch, and that CNR did not have the right to fire any of the Denny employees. He stated that if a customer expresses dissatisfaction with a driver and asks that that driver not be sent out again, the Denny Company customarily would send out a different driver the next time it served that customer. He explained that "to that extent they had control over it (the driver)."
George testified that he was "in charge of actually loading the trucks," that he was the "boss of the drivers that were there," that he told his swamper, Branch, what to do, and that he made the decisions as to which pieces of dismantled equipment were to be loaded on particular trucks. Sam Waller, a driller for CNR, stated that he was not "in charge of any truck," that George, the truck pusher for Denny was in charge of the trucks and all of the swampers who were on that job, and that neither he nor any other employee of CNR told the trucking company employees how to load or how to operate the trucks. James Thompson, another driller for CNR, stated that the truck pusher (George) was "foreman over the trucks," that he "gives directions and instructions to the truck drivers and the swampers out there," and that he decided "how to load the trucks" and "when they would leave and when they would come back." Substantially the same views were expressed by another driller and by the tool pusher for CNR.
In determining whether the borrowed servant doctrine applies, there is a presumption that the general employer retains control of and remains liable for the negligent acts of his employee. If the general employer (Denny in this case) seeks to avoid liability on the ground that his employee is the "borrowed servant" of another, then the burden of proof rests upon the general employer to show that as to the particular work in question the employee has been loaned, that the relationship of master and servant which theretofore existed between the general employer and employee has been suspended, that a new relationship of master and servant has been created between the borrowing employer and that employee, and that this new relationship was in existence at the time the accident occurred. Universal Engineers & Builders, Inc., v. Lafayette Steel Erector Corporation, 235 So.2d 612 (La.App. 3 Cir. 1970); Benoit v. Hunt Tool Company, 219 La. 380, 53 So.2d 137 (1951); B & G Crane Service v. Thomas W. Hooley & Sons, 227 La. 677, 80 So.2d 369 (1955); McCutchen v. Fruge, 132 So.2d 917 (La.App. 3 Cir. 1961); Truitt v. B & G Crane Service, Inc., 165 So.2d 874 (La.App. 4 Cir. 1964); Brown v. B & G Crane Service, Inc., 194 So.2d 746 (La.App. 4 Cir. 1966); Kezerle v. Hardware Mutual Casualty Company, *787 198 So.2d 119 (La.App. 3 Cir. 1967); Owens v. AAA Contracting Company, 219 So.2d 226 (La.App. 1 Cir. 1969); and Barrois v. Service Drayage Company, Inc., 250 So.2d 135 (La.App. 4 Cir. 1971).
Varying tests have been applied in determining whether or not an employee is to be classified as a "borrowed servant." One important test to be applied in making that determination is to ascertain who controls him in that employment, and more particularly, who has the power and the right to control and direct him in the performance of his work. Anther important test is to determine whether the general employer has surrendered or has relinquished control over the employee, that is, whether the master-servant relationship between the general employer and the employee had been terminated or suspended and did not exist at the time the accident occurred. McCutchen v. Fruge, supra; Richardson v. Tate, 269 So.2d 278 (La.App. 4 Cir. 1972; Hislop Plumbing Company, Inc. v. Pogue-Atkins, Inc., 283 So.2d 808 (La.App. 2 Cir. 1973); Kezerle v. Hardware Mutual Casualty Company, supra; LeBlanc v. Roy Young, Inc., 308 So.2d 443 (La.App. 3 Cir. 1975).
The issues in the present suit are similar to those which were presented in LeBlanc v. Roy Young, Inc., supra. In that case we held that the master-servant relationship between the general employer and its employee, a crane operator, had not been suspended, and that the employee thus did not become the employee "pro hac vice" of the alleged borrowing employer.
In the instant suit we find that George and Branch had not been "loaned" to CNR, and that the latter did not exercise any control over those employees, other than to direct where and when the work was to be done. We also find that the general employer, Denny Trucking Company, did not relinquish its control over or its right to control these employees, and that the master-servant relationship between Denny, on the one hand, and George and Branch on the other, still existed at the time the accident occurred. Our conclusion is that George and Branch were not employees "pro hac vice" or "borrowed servants" of CNR at the time of the above accident. The Denny Company and its insurer thus are responsible for the acts of those employees.
In our opinion, the trial court erred in finding that defendant Denny was free from negligence. We have decided that that defendant was negligent, and that intervenor is entitled to recover from defendants the amount which it paid to the injured employee as compensation benefits.
The parties stipulated that Highlands paid $11,149.61 to plaintiff Miller as workmen's compensation benefits, and that in the event defendants are found to be liable intervenor is entitled to recover that amount.
For the reasons herein set out, the judgment appealed from is reversed, and judgment is hereby rendered in favor of intervenor, Highlands Insurance Company, and against defendants, L. J. Denny and Son Trucking Company and State Automobile Insurance Association, in solido, for the sum of $11,149.61, with legal interest thereon from date of judicial demand until paid, and for all costs incurred by intervenor in this suit. The costs of this appeal are assessed to defendants-appellees.
REVERSED and RENDERED.