356 So.2d 537 (1978)
Theotis Fontenot LeJEUNE et al., Plaintiffs-Appellants,
v.
ALLSTATE INSURANCE CO. et al., Defendants-Appellees.
No. 6252.
Court of Appeal of Louisiana, Third Circuit.
February 6, 1978.
Writ Granted May 19, 1978.
*538 Guillory, McGee & Mayeux by Robert K. Guillory, Eunice, for plaintiff-appellant-appellee, Theotis F. LeJeune.
*539 C. Brent Coreil, Ville Platte, for defendant-appellant-appellee, Danny Glenn Lafleur.
Brame, Bergstedt & Brame, Joe A. Brame, Lake Charles, for defendant-appellant, Zurich Ins. Co.
Davidson, Meaux, Sonnier & Roy, Edward O. Taulbee, IV, Lafayette, for defendants-appellees-appellants, Randall Molitar, et al.
Raggio, Farrar, Cappel & Chozen by Stephen A. Berniard, Jr., Lake Charles, for defendant-appellant, Danny G. Lafleur.
Young & Burson by Joe Ortego, Eunice, for plaintiff-appellee, Ivy Fruge Molitor.
Fusilier, Pucheu & Soileau by L. O. Fusilier, Ville Platte, for plaintiff-appellant-appellee.
John Larry Vidrine, Ville Platte, for defendant-appellee-appellant.
Jack C. Fruge, Ville Platte, for defendants-appellees, Willie Smith and Dixie Auto. Ins. Co.
Lewis & Lewis, James T. Guglielmos, Opelousas, for defendant-appellee.
Voorhies & Labbe, Patrick A. Juneau, Jr., Lafayette, for defendant-appellee, Western World Ins. Co.
Calvin E. Hardin, Jr., Baton Rouge, for defendant-appellee, Ins. Co. of North America.
Allen, Gooch & Bourgeois, Ltd., Arthur I. Robison and Michael Harson, Lafayette, for intervenor-appellant, Insurance Co. of La.
Before CULPEPPER, DOMENGEAUX and JOHNSON, JJ.
JOHNSON, Judge.
This appeal is from cases arising out of an automobile accident. They arise from a collision which occurred at the intersection of two hard surfaced state highways. It occurred at 3:00 in the afternoon on a clear day, November 13, 1974. One highway runs east and west; the other, north and south. Visibility is good for a considerable distance in all directions. Drivers of cars can see one another for a good distance before reaching the intersection. The east-west highway had the right of way; however, traffic traveling east or west was faced with a constantly blinking yellow caution light located some eighteen to twenty feet above the center of the intersection. This requires by law that traffic enter the intersection cautiously. Both highways were hard surfaced with two lanes for traffic. The traffic traveling the north-south highway from either direction was faced with a stop sign located on the right hand side of the driver's vehicle in each instance. In addition, for traffic moving north and south there was over the center of the intersection a large flashing red light. This light required traffic to stop. It, along with the stop sign, was an admonition to traffic approaching from the north or south to stop before entering the intersection. These signs also required such traffic to give way to east-west traffic after stopping.
At the place and time involved, a funeral procession was proceeding northward with two or three vehicles of the procession having crossed the intersection. The hearse was approaching and about to enter the intersection. All vehicles in the funeral procession had their headlights burning. A number of vehicles were following the hearse.
At this time, some 300 to 500 feet away, the evidence discloses that a Mercury Marquis Sedan was being driven in a westerly direction toward the intersection at a speed probably in excess of a hundred miles per hour. The Cadillac hearse proceeded into the intersection without stopping. The driver of the Mercury automobile, apparently, at this instant about 300 feet away, realized the danger and was able to lay down skid marks of about 154 feet in length. Despite the skid marks, the Mercury automobile struck the Cadillac hearse approximately in the right hand center of the hearse. The actual impact was after the Cadillac hearse, headed North, had completely cleared the east-west-roadway (Hwy. 10) but was in close proximity thereto. The photographs in evidence show that the intersection is broad and flares out *540 wider than the two highways. The impact resulted in the death of the funeral director who was a passenger in the hearse. It resulted in injuries to the driver of the hearse and injuries to the driver of the Mercury automobile. Both vehicles, heavily damaged, ended up in a field adjacent to the northwest corner of the intersection. The coffin was dislodged from the hearse and ended up in the intersection.
The above recited statement of facts seems not too complicated upon presentation. The various legal problems and issues arising from this accident are far from simple. The presentation of the various problems that have arisen has resulted in multitudinous pleadings, cross claims, third party claims, interventions, answers, amending and supplemental petitions, reconventional demands, exceptions, motions for summary judgment, etc.
In these three consolidated cases consisting of seven bound volumes of records, four of the volumes are devoted to pleadings alone. This has resulted in a legal guagmire of monumental proportions. The powers that be in the legal profession in Louisiana concerned with simplification and streamlining of procedure could well use these cases and these records as an example to justify additional work in this area. If this record represents an example of what Louisiana third party practice is headed for, it is believed that we will rival or surpass the common law pleadings of yesteryear.
We find that the learned trial judge, with one exception, has properly disposed of the numerous issues which have arisen herein. We take the liberty of repeating his reasons for judgment with additional comment and quotation of authorities wherever we feel it is indicated.
We quote from his Reasons for Judgment:
These cases, consolidated for trial, arise from a hearse-automobile accident in the Parish of Evangeline, Louisiana. The facts are these:
Rolance LeJeune died instantly as a result of a hearse-automobile accident which occurred at the intersection of Louisiana Highways 10 and 13, on November 13, 1974, at approximately 2:58 P.M. Both highways, at the time of the accident were hard-surfaced, two-lane highways. The intersection was controlled by a stop sign and a semaphore light blinking red for traffic on Louisiana 13, and amber or yellow for traffic on Louisiana 10.
The hearse was being driven north on Louisiana 13, an inferior highway, by Danny Lafleur, an employee of Ardoin's Funeral Home of Ville Platte, Inc., for Ardoin's Funderal Home of Mamou, Inc. Having been assigned this task by the director of Ardoin's Funeral Home of Ville Platte, Inc., pursuant to a request of Rolance LeJeune, the director of Ardoin's Funeral Home of Mamou, Inc., Lafleur was under the supervision and control of LeJeune at the time of the accident. The automobile, the other vehicle in the collision, was being driven by Randall Molitor, and was the property of his widowed mother, Mrs. Ivy Molitor, with whom he resided.
When the accident occurred, the hearse, part of a cortege proceeding from Mamou to Pine Prairie for a funeral service and interment, was led by an Evangeline Parish sheriff's car, which signalled with a flashing red light. The driver of this car, deputy Willie Smith, had never before led a funeral procession on this route, and was untrained in the manner in which such a procession was to be escorted and in the manner in which intersecting avenues of travel should be secured to allow unimpeded travel to a motorcade of this kind. As Smith reached the intersection where the accident subsequently occurred, he did not stop and secure the intersection with his automobile, nor did he get out of his car to direct traffic. Instead, he stopped in the intersection, looked both ways, saw no approaching traffic on Louisiana Highway 10, and proceeded across the intersection as he continued to escort the vehicles which followed.

*541 Upon arriving at the intersection where the accident occurred, Danny Lafleur, the driver of the hearse, slowed down but did not stop. He knew and observed that the intersection had not been secured by the police escort and that no one was directing traffic at the intersection to allow traffic on Louisiana Highway 13 the right of way over the superior right of way of the intersecting Louisiana Highway 10. He could see that the intersection was controlled by a stop sign and a red-blinking semaphore light for traffic on Louisiana Highway 13, and being familiar with the intersection, he knew it to be dangerous. Too, although he had observed that the Molitor car was traveling towards the intersection on Louisiana 10 and that the driver did not give any indication that he was going to stop, Lafleur nevertheless attempted to cross the intersection.
Randy Molitor, driving an automobile at a grossly excessive rate of speed, failed to reduce his speed as he approached the intersection, and collided with the hearse near the northeast quadrant of the intersection close to or out of the extension of the west-bound lane of Louisiana 10 as it crosses Louisiana 13. As a result, Mr. LeJeune, a passenger in the right front seat of the hearse, was killed.
Considering the evidence, I therefore find:
1) That Danny Lafleur was negligent in causing the accident and the consequent death and damages. He saw or should have seen the Molitor car in too close proximity to the intersection to proceed across. He had a flashing red light, he knew he was on an inferior highway, and he knew that no officer was directing traffic at the intersection so as to take precedence over the posted stop sign and the flashing red light. Therefore he should not have proceeded until he was certain that he could negotiate the crossing in absolute safety and that the oncoming car had stopped or would stop to allow the funeral procession to move through the intersection.
Additionally, we note in passing that the driver of the Guillory automobile, immediately following the hearse, did observe the rapid approach of the Molitor automobile. Out of an abundance of caution, he did stop his vehicle before entering the intersection. Of course, in all fairness, the Molitor vehicle was undoubtedly much closer to the Guillory vehicle than it was to the hearse. Nevertheless, all of the evidence, and particularly the photographs, shows that the intersection was absolutely open and clear in all directions and that one approaching the intersection had nothing to obstruct his view. The open fields had no impediments to one's view. One approaching from the south, as the hearse was doing, had a building 150 feet south of the intersection on the right. After clearing that obstruction, there was nothing but clear unobstructed viewing.
The trial judge continues.
2) Randy Molitor was negligent, and his negligence was a cause of the resultant accident and death. He was driving too fast and did not have sufficient control of his vehicle. He failed to maintain a proper lookout; and, when confronted with an amber caution light, he should have ascertained prior to entering the intersection whether he could proceed into the crossing with safety.
3) Officer Smith may have been negligent in not stopping to secure the intersection by directing traffic or by stopping or blocking LA. 10, with his police car; however, under the factual situation of this case, I do not find that this conduct constituted a cause-in-fact of the accident.
Officer Willie Smith was sixth-two years of age, had very little education and had had no formal training in how to escort funeral processions. He had escorted a number estimated by him to be 35 or 40 in the past. He did stop. Seeing that the intersection was clear, he proceeded. He was several car lengths ahead of the hearse when the collision occurred. The weight of the evidence indicates that the automobile carrying the pallbearers was the only automobile *542 between the deputy sheriff and the hearse. Other witnesses say that the car with the priest and alterboys was between the deputy's car and the pallbearers.
Made defendants herein, were two insurance companies insuring the sheriff and his deputy. The first was a policy in the amount of $1,000,000.00, being a general liability policy covering the Sheriff's Department and his deputies for bodily injury and property damage combined. This was written with Western World Insurance Company, Inc. The other policy was an automobile liability policy written by Dixie Auto Insurance Company covering the various automobiles used by the Sheriff's Department. Limits of the Dixie policy were $10,000.00 per person and $20,000.00 per accident. The insurers of the Evangeline Parish Sheriff's Department, as hereinabove shown, were sued, alleging the negligence of Deputy Willie Smith. The allegations further set forth that the Sheriff is responsible for the torts of his deputy. They allege that, on the basis of respondeat superior, both of the insurance carriers are liable to those sustaining injuries and losses in this matter.
A recent judgment of our Louisiana Supreme Court decided November 14, 1977, answers, we find, the contentions of plaintiffs with respect to the claims against Western World Insurance Company, Inc., the general liability carrier of the Sheriff's Department. The case is Foster v. Hampton et al., 352 So.2d 197 (La.1977). Foster v. Hampton, 343 So.2d 219 (La.App. 1 Cir. 1977). The Supreme Court interprets LSA-R.S. 33:1433, and the decision reads in pertinent part as follows:
"Foster is wrong in his contentions that a finding that Deputy Hampton was engaged in the performance of an official duty would subject the sheriff to liability under the provisions of R.S. 33:1433. R.S. 33:1433 specifically provides that no liability attaches to the sheriff beyond the bond or liability insurance furnished by the deputy unless the act or tort of the deputy was `in compliance with a direct order of, and in the personal presence of, the said sheriff, at the time the act or tort is committed.' (Emphasis added). The statute contemplates personal liability of the sheriff for those acts he personally controls; for such acts the legislature has determined that the sheriff should be answerable. The sheriff is subject to liability up to the limits of the bond or liability insurance furnished by the deputy for the official acts of the deputy which he does not directly control. No allegation is made by Foster that Hampton was acting in compliance with a direct order of and in the personal presence of the sheriff. Therefore, the sheriff cannot be held liable under the provisions of R.S. 33:1433."
The Supreme Court in its opinion enforces the above cited statute as written. Since the evidence herein shows that the sheriff was not present at the time of the accident complained of herein, and that Smith was not acting in compliance with a direct order of the sheriff, there is no liability for the sheriff nor for his general liability carrier under the facts as shown. This relieves Western World from liability and we affirm the judgment of the trial court in favor of Western World Insurance Company.
This leaves for consideration the liability of Dixie Auto Insurance Company on its automobile liability policy on the vehicle involved herein. It appears that this policy covering the car would apply. To be noted is that the sheriff and Willie Smith were not made defendants by any of the plaintiffs herein. Willie Smith was impleaded in some of the third party pleadings. It thus becomes necessary to consider further the trial court's finding that Willie Smith's possible negligence by not stopping to secure the intersection was not a "cause-in-fact" of the accident.
It may well have been that the trial judge considered that the obvious negligence of Randall Molitor and of Danny Lafleur were the only causes-in-fact of the accident. Lafleur was traveling slowly. He had no reason to enter the intersection. It would have been very simple to have stopped the hearse. Danny Lafleur traveled *543 through this intersection having a width of some 40 to 60 feet at a speed of approximately 20 miles an hour. If the other vehicle was traveling at 100 miles per hour it would have traveled five times as far in the same time as Danny Lafleur traveled. This would have placed the Molitor vehicle some 200 or 300 feet from the intersection at the time Lafleur entered the intersection. If we vary these distances or these speeds just a slight bit, we still have the other vehicle approximately 300 feet away at the most when Danny Lafleur entered this intersection with his vehicle. The Molitor vehicle was certainly in plain view and any observer would have realized that it was coming at an excessive rate of speed.
Another question which arises is whether the presence of the sheriff's vehicle with a revolving red light on top would have caused the Molitor vehicle to stop without injuring anyone. To be remembered is that Randall Molitor, the driver of the Molitor vehicle, had facing him a large yellow flashing light twenty feet above the highway requiring him to enter the intersection cautiously. In addition, he had strung out in front of him, and in clear view across his horizon ahead, a police car with a flashing red light, a second car with pallbearers, the hearse entering the intersection, and a number of cars behind the hearse up to a distance of 150 feet south of the intersection. These cars were in close proximity to one another and had headlights burning. They were traveling slowly. This is what Randy Molitor was looking at, had he been looking.
The question is whether the presence of the sheriff's vehicle would have been enough to cause Molitor to slow his vehicle and avoid the accident. We must remember also, that there was only one sheriff's vehicle. It could have been placed on the opposite side of the funeral cortege. That is, it could have been on the western side of the intersection and; because of the funeral procession, even less obvious to the view of Randall Molitor. To be kept in mind at all times is that Randall Molitor became aware of the situation ahead of him some 300 feet from the intersection and immediately made an effort to stop his vehicle. The result, as we know from the evidence, is that he still struck the hearse traveling at a speed of from 50 to 70 miles per hour, and this after 154 feet of skid marks.
Our Supreme Court admonishes us in Canter v. Koehring Co., 283 So.2d 716 (La. 1973) on page 724, as follows:
"When there is evidence before the trier of fact which, upon its reasonable evaluation of credibility, furnishes a reasonable factual basis for the trial court's finding, on review the appellate court should not disturb this factual finding in the absence of manifest error. Stated another way, the reviewing court must give great weight to factual conclusions of the trier of fact; where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. The reason for this well-settled principle of review is based not only upon the trial court's better capacity to evaluate live witnesses (as compared with the appellate court's access only to a cold record), but also upon the proper allocation of trial and appellate functions between the respective courts."
Taking these admonitions from Canter, we conclude that the trial judge had evidence furnishing it a reasonable factual basis upon which to determine that Deputy Willie Smith's negligence, if any, was not a cause-in-fact of this accident. We affirm his findings in this respect, and his finding that Dixie Auto Insurance Company is not liable herein.
Counsel for the parties herein have favored the court with excellent briefs on the question of cause-in-fact. They cite numerous cases and authorities from the jurisprudence, including, Ruminations on Dixie Drive It Yourself v. American Beverage Co. by Wex S. Malone, 30 La. Review 363; Reasons v. Rule in Louisiana Tort Law 34 La.Law Review 1; "Proximate Cause in Louisiana", 16 La.Review 391 (1956); Dixie *544 Drive It Yourself System v. American Beverage Co., 242 La. 471, 137 So.2d 298 (1962); Moore v. Edison Electric Illuminating Co., 43 La.Ann. 792, 9 So. 433 (1891); Atkins v. Bush, 141 La. 180, 74 So. 897 (1917); Allen v. La. Creamery Inc. et al., 184 So. 395 (La.App. 1 Cir. 1938); Lynch v. Fisher, 34 So.2d 513 (La.App. 2 Cir. 1947); Pierre v. Allstate Ins. Co., 257 La. 471, 242 So.2d 821 (1971); Hill v. Lundin & Assoc. Inc., 260 La. 542, 256 So.2d 620 (1972); Shelton v. Aetna Casualty & Surety Co., 334 So.2d 406 (La. 1976); State Farm Mutual Ins. Co. v. South Central Bell, 343 So.2d 758 (La.App. 3 Cir. 1977).
These citations from the jurisprudence and the law reviews deal with proximate cause, duty-risk, cause-in-fact, necessary antecedent, and various other concepts considered in determining whether negligence is to be causally related to injury, or loss, and to result in responsibility therefor. We find nothing in this jurisprudence to alter our finding, in view of the foregoing, that the trial court should be affirmed in his holding that the deputy's actions were not a cause-in-fact of this accident.
The trial judge continues.
4) I am also convinced that no actionable negligence has been shown on the part of Mrs. Ivy Molitor, the mother of the driver of the Molitor automobile.
A number of the parties herein allege that Randy Molitor had such a bad record for driving violations, for the use of alcohol, and for the use of marijuana, that his mother, in permitting Randy to drive her automobile, is guilty of independent negligence. Randy was either eighteen or nineteen years old at the time of the collision; and, because of his age, he was no longer a minor. He did reside in his mother's home.
The Court has made a brief resume of Randy's driving record. Originally, the trial judge excluded this record for obvious reasons and it was introduced by means of a proffer. Subsequently, it is believed that counsel has agreed to its admissibility. The record as near as we can make out is as follows:

DATE CHARGE DISPOSITION
12/31/70 Left side parking forfeited $10.00 bond
1972 prior to disobeying stop sign $15.00 fine and court costs
June 15th
 5/10/73 following too closely plead guilty paid fine $25.00 and
 $17.50 court costs
 5/14/73 speeding $10.00 fine and $17.50 court costs
 9/16/73 careless operation of a forfeited $25.00 bond
 vehicle with accident
12/26/73 operating motor vehicle forfeited bond $10.00 and $22.50
 with no inspection sticker costs
 4/13/74 speeding 75 in 55 mile forfeited $10.00 fine and $22.50
 zone court costs
 7/28/74 speeding 70 in 55 mile driver's license sent to Dept. of
 zone Public Safety bond for redemption
 $72.50
1974 prior to disobeying stop sign $25.00 fine and court costs
August 22nd
11/10/74 Possession of Marijuana no disposition given

To be noted in the record is that most of these are minor traffic violations and occurred over a period from 1970 to 1974. The evidence does show, however, that Randy these had at least two fairly serious accidents. It shows that for a period prior to August *545 22, 1974, until after the accident complained of herein, on November 13, 1974, that Randy had no traffic violations.
Randy Molitor was the only driver in the household consisting of himself, his mother and his thirteen year old sister. He had to take his mother everywhere she went in the automobile. She apparently had confidence in his driving. The evidence shows that while she had knowledge of one or two accidents he had been in, apparently she had no knowledge of a number of the traffic violations as shown hereinabove. The question we are concerned with here is not whether Randy was such a reckless automobile driver that Mrs. Molitor should not have permitted him to drive. The question is whether or not Mrs. Ivy Molitor had knowledge of this situation and, therefore, is to be held negligent and liable to plaintiffs for permitting Randy to drive. Her testimony indicates the contrary. In line with Canter, we find that the trial judge had adequate evidence before it for a finding that Mrs. Molitor is not to be held liable under the circumstances and the evidence presented herein. The jurisprudence supports such a finding. Davis v. Shaw, 142 So. 301 (La.App. 2 Cir. 1932); Bailey v. Simon, 199 So. 185 (La.App.Orl.1940); Kemp v. Fourmy, 265 So.2d 651 (La.App. 2 Cir. 1972);
In Kemp, the Court states the law on page 653 and I quote:
"Our law is to the effect that the owner of a vehicle is not responsible to a third party for the negligence of the driver of that vehicle unless he knew or should have known that the driver was incompetent. Morton v. American Employers Insurance Company, La.App., 104 So.2d 189 (2nd Cir. 1958); Macaluso v. Watson, La. App., 188 So.2d 178 (4th Cir. 1966) writ refused, 249 La. 743, 190 So.2d 910 (1966); Asher v. Good, La.App., 198 So.2d 434 (4th Cir. 1966); Winzer v. Lewis, La.App., 251 So.2d 650 (2nd Cir. 1971) writ refused, 259 La. 934, 253 So.2d 379 (1971)."
The trial judge continues.
5) Mr. Lafleur was a borrowed servant of Ardoin's Funeral Home of Mamou, having been borrowed by them from Ardoin's Funeral Home in Ville Platte. The rule is that the general servant of one person may be lent to and may become the servant of another by submitting himself to the direction and the control of the other with respect to a particular transaction or piece of work, even though the general employer has an interest in the special work. The servant thus remains the general servant of the lender except as to the particular work done by the borrower. In this case, such a relation between borrower and servant has been established; and it has also been established clearly that the servant had expressly or at least by implication consented to the transfer of his services to the new master for this particular task, and that he did surrender to the borrower the assumed power of supervision and control. Also, even though both funeral homes are owned by the same person or persons or group of corporations, in law they are two separate corporations, and, hence, two separate legal entities.
The evidence discloses that Danny Glenn Lafleur was employed in Ville Platte. It also discloses that, corporations very closely allied and possibly owned by the same interests, and using the same name except for the city or town, operated in the general area. The two involved here were Ardoin's Funeral Home of Ville Platte and Ardoin's Funeral Home of Mamou. There was also one Ardoin's of Eunice and a corporation having a similar name in Opelousas, as well as others. The evidence discloses that as the need arose, these corporations would shift their personnel from one, then to another funeral home, for short periods of time. This worked to the mutual benefit of the corporations, as the evidence shows. Mr. Landreneaux, manager of Ardoin's of Ville Platte was asked for help by Mr. Rolance LeJeune, manager of Ardoin's of Mamou. Danny Lafleur, an employee of the Ville Platte Funeral home, was instructed by Mr. Landreneaux to report to Mr. LeJeune at 1:00 on November 13, 1974. He did so and his tour of duty with the Mamou *546 Mortuary would have concluded around 4:30 or 5:00 that afternoon upon the termination of the funeral.
The evidence discloses that for that three and a half or four hour period Danny Glenn Lafleur was under the total direction and control of Rolance LeJeune, manager of the Mamou Mortuary. There is not any question whatsoever but what Mr. LeJeune had total authority to tell Danny Lafleur what to do, when to do it, and how to do it. Under these circumstances, there can be no question but what Danny Glenn Lafleur was a borrowed servant of Ardoin's of Mamou.
The jurisprudence as we view it holds that whoever controls the employee during the period of time in question and whoever has the power and right to control and direct him in the performance of his work is a borrowing employer. McCutchen v. Fruge, 132 So.2d 917 (La.App. 3rd Cir. 1961); Kezerle v. Hardware Mutual Casualty Co., 198 So.2d 119 (La.App. 3 Cir. 1967); Universal Engineers and Buildings, Inc. v. Lafayette Steel Erector Corp., 235 So.2d 612 (La.App. 3 Cir. 1970); Highlands Ins. Co. v. L. J. Denny & Son, 328 So.2d 779 (La.App. 3 Cir. 1976); Vincent v. Ryder Enterprises Inc. et al., 352 So.2d 1061 (La. App. 3 Cir. 1977).
The trial court continues.
6) The Insurance Company of North America provided automobile liability coverage for Ardoin's Funeral Home of Mamou, Inc., and for Ardoin's Funeral Home of Ville Platte, Inc. Both businesses were covered under a common fleet policy; but since they are distinct corporations, their insurance coverage must be separately examined.
7) Ardoin's of Ville Platte was Danny Lafleur's general employer. It is presumed that the general employer retains control of and remains liable for the negligent acts of the employee. However, the general employer may avoid liability upon showing that the relationship of master and servant which previously existed between the general employer and employee has been suspended, that another such relationship has been created between a borrowing employer and that employee, and that such new relationship was in existence at the time the accident occurred. This was shown at the trial; therefore, Ardoin's of Ville Platte was not responsible in damages for the torts committed by Lafleur, and there was no coverage by Insurance Company of North America as the insurer of Ardoin's of Ville Platte. McCutchen v. Fruge, 132 So.2d 917, 925 (La.App. 3rd Cir. 1961)
8) Ardoin's of Mamou had borrowed Lafleur from Ardoin's of Ville Platte. When an employee, with his consent, has been borrowed from his general employer by another person, he is deemed to have become the employee of the borrower. Miller v. B. Lewis Contractors, 103 So.2d 592, 597 (La.App. 1st Cir. 1958). As a borrowed employee, Lafleur became a fellow employee of Rolance LeJeune, the deceased, and would be excluded from Insurance Company of North America's coverage of Ardoin's of Mamou by the following policy provision:
"None of the following is an insured:
1) Any person while engaged in the business of his employer with respect to bodily injury to any fellow employee of such person injured in the course of his employment;"
Thus, while Lafleur was acting for the benefit of Ardoin's of Mamou, he would be excluded from coverage by their policy.
Plaintiffs herein argue that, even though there is a finding that Lafleur was a borrowed servant, he is not covered by the exclusion. They argue that Lafleur, as a borrowed employee, would not be excluded from liability coverage by reason of him being a co-employee. Counsel thus argues that a borrowed servant does not become a co-employee for the purpose of insurance coverage with the other regular employees of the borrowing employer. It seems that this is an attempt to make a distinction when there is no difference. Under the doctrine of respondeat superior, a borrowing employer is liable for the torts of the *547 borrowed employee. B. & G. Crane Service v. Thomas W. Hooley & Sons, 227 La. 677, 80 So.2d 369. Conversely, under such circumstances, a lending employer is not liable. Miller v. B. Lewis Contractors, 103 So.2d 592 (La.App. 1 Cir. 1958). Also McCutchen v. Fruge, supra.
The trial judge continues.
9) Danny Lafleur does have coverage as a named insured in an automobile liability policy issued by Zurich Insurance Company. The pertinent policy language follows:
"This policy does not apply under Part I:
a) to any automobile while used as a public or livery conveyance. . . ."
The phrase "public or livery conveyance" means the indiscriminant holding out of the vehicle for public use where the operator uses the vehicle as a means of conveying members of the public who may call for such service. Spears v. Phoenix Insurance Company, 149 So.2d 118, 122 (La.App. 2 Cir. 1963) The vehicle which Lafleur operated was held out indiscriminately, but its use was as a hearse rather than for the transportation of passengers or members of the general public.
10) This coverage extended to Lafleur's use of the non-owned automobile provided that it was not furnished for his regular use. There was a regular driver employed by Ardoin's of Mamou. Lafleur's use was not regular because it was not steady or uniform in practice. He did not drive the hearse at regular and predictably certain intervals. Rather his use was at irregular intervals only when he was borrowed from Ardoin's of Ville Platte. His use of the hearse was casual or infrequent and thus within the definition of a non-owned automobile under the policy. Wirick v. Wyble, 300 So.2d 571, 574 (La.App. 3rd Cir. 1974)
It is here that we disagree with the trial court. There is an additional exclusion which is found under exclusion "h (2)". Our ruling on exclusion "h (2)" is that the Zurich Insurance Company policy is not applicable. We hold that it does not provide any coverage to Danny Glenn Lafleur. It does not cover the vehicle he was driving at the time of the collision. This makes it unnecessary for us to consider the rulings of the trial court herein with respect to whether or not the hearse was a "non-owned automobile" not furnished for the regular use of Danny Lafleur, and the trial court's ruling that the hearse was not a public or livery conveyance. We pretermit any discussion of those rulings.
The exclusion we are concerned with here, as relevant herein, reads as follows:
"Exclusions. This policy does not apply under Part 1."
"(a) .....
"(b) .....
"(c) .....
"(d) .....
"(e) .....
"(f) .....
"(g) .....
"(h) to a non-owned automobile while maintained or used by any person while such person is employed or otherwise engaged in
(1) the automobile business of the insured or of any other person or organization
(2) any other business or occupation of the insured, but this exclusion (h)(2) does not apply to a private passenger automobile operated or occupied by the named insured or by his private chauffeur or domestic servant or a trailer used therewith or with an owned automobile . . ."
Exclusion "h(2)" provides that a non-owned automobile is covered by Danny Lafleur's insurance even though it is being used for a business use unless, 1, it is being used in the automobile business or, 2, unless it is not a "private passenger automobile".
From the foregoing, if a hearse is a private passenger automobile, then it would be a covered vehicle under the Zurich Insurance policy. Thus Danny Glenn Lafleur would be covered herein. We do not find from the evidence and from the jurisprudence, that a funeral hearse is a "private passenger automobile".
*548 The Zurich Insurance policy involved herein defines a private passenger automobile as follows:
"Private passenger automobile" means a four wheel private passenger, station wagon, jeep type automobile;
It is clear that a funeral hearse is not a private passenger automobile. It is not designed for the carrying of passengers. It does not fit this definition. This vehicle was not used to carry passengers.
Our Appellate Courts apparently have not dealt directly with this precise point. In Riker v. Aetna Casualty Surety Company, 286 So.2d 493 (La.App. 1 Cir. 1973) the Court dealt with a similar exclusion with respect to a pickup truck. In that case the Court held that the pickup truck was "a private passenger automobile." The Court reasoned that the pickup truck was used more for the carrying of passengers then it was for hauling purposes. It therefore held a pickup truck to be a private passenger automobile under the evidence in that case.
We cannot see how the same reasoning would apply to a funeral hearse. The Court has reviewed a number of authorities and several cases in the jurisprudence involving the definition of private passenger automobile. We hold that a funeral hearse does not fit such a category. The authorities are: Volume 33A Words and Phrases "Private Passenger Automobile" page 447; Ricker case, supra; Employer Mutual Liability Insurance Co. of Wis. v. Richards, 332 So.2d 588 (La.App. 4 Cir. 1976); Laraway v. Heart of America Life Insurance Co., 153 W.Va. 70, 167 S.E.2d 749 (1969); Commercial Insurance Co. of Newark, N. J. v. Gardner, 233 F.Supp. 884 (D.C.1964); Kern v. Liberty Mutual Insurance Co., 274 F.Supp. 360 (D.C.1967); Detmer v. United Security Insurance Co., 309 S.W.2d 713 (Mo.App. 1958); Senn's Adm'x v. Michigan Mutual Liability Co., 267 S.W.2d 526 (Ky.1954); State Farm Mutual Auto. Insurance Co. v. Durrett, 472 S.W.2d 214 (Tex.Civ.App., 1971).
We find that the district court failed to consider exclusion "h(2)". Our consideration of this exclusion causes us to hold that, because of this exclusion, Danny Glenn Lafleur was not covered by the Zurich Insurance Company policy. This policy was the insurance for his privately owned passenger automobile. We accordingly reverse the district court and hold that Zurich Insurance Company must be absolved from liability herein.
The trial court continues:
11) Randall Molitor was driving his mother's automobile with her permission. The Allstate Insurance policy provided coverage for "any person while using the automobile ...... provided the actual use of the automobile is by the named insured or such spouse or with the permission of either." Thus, this policy extends to Randall Molitor's use of the car.
12) At the time of his death, Rolance LeJeune was forty-eight years of age. His family was very close-knit and spent much, if not most, of their leisure time together. In his capacity as funeral home director, Mr. LeJeune was provided with a home having a yearly use value of $3,379.40. With the extension of his salary through twelve months, he would have earned $6,876.00 in 1974. His work life expectancy at age 48 was 17.0 years. He was survived by his wife, age 46, three major children, and a minor child, aged 9.
I find the following awards are in order:

Theotis LeJeune
 Loss of love, affection and
 companionship ................. $ 25,000.00
 Loss of support ............... 77,941.14
 ___________
 TOTAL $102,941.14
David LeJeune
 Loss of love, affection, and
 guidance ..................... $ 12,500.00
 Loss of support ............... 18,459.72
 ___________
 TOTAL $ 30,959.72
Joseph LeJeune
 Loss of love, affection, and
 guidance .................... $ 7,500.00
Jerry LeJeune
 Loss of love, affection, and
 guidance ..................... $ 7,500.00
Terral LeJeune
 Loss of love, affection, and
 guidance .................... $ 7,500.00

*549 13) As provided in R.S. 23:1103, the claim of the employer, Ardoin's Funeral Home of Mamou, Inc., for the workmen's compensation actually paid shall take precedence over the claims of Theotis LeJeune and her children, David, Joseph, Jerry, and Terral.
Plaintiffs complain that the awards are inadequate. The widow received $102,941.14. The minor child $30,959.72. The three major children $7,500.00 each. The only insurance available to pay these claims is in the amount of $5,000.00 being the amount of coverage on the vehicle being driven by Randy Molitor. The widow and minor child of Rolance LeJeune have and will receive compensation and burial expenses in excess of the $5,000.00 insurance available. The workman's compensation carrier will have first claim to these insurance funds. The evidence shows that Randy Molitor has inherited property interests from his deceased father; however, the evidence did not indicate that these property interests have any particularly great value.
Ashley v. Nissan Motor Corporation in USA, 321 So.2d 868 (La.App. 1st Cir. 1975) holds that where the ability to pay is limited or where one is impecunious, these facts must be taken into consideration in making an award. Also see Domingeaux v. Continental Insurance Company et al., 348 So.2d 209 (La.App. 3 Cir. 1977).
The recent Supreme Court case of Coco v. Winston Industries, 341 So.2d 332 (La.1976) points out that the trier of fact has a wide latitude in the assessment of damages. It further holds that the trial court's assessment of damages will not be disturbed so long as the award is within reasonable limits allowed to the trier of fact. We hold that the damages awarded herein, when considering all of the evidence and the jurisprudence, falls within the general range available to the trial court herein. We therefore affirm the damage awards herein.

DECREE
For the above and foregoing reasons, we amend the judgment of the district court insofar as the district court held Zurich Insurance Company liable for damages and court costs herein.
The district court ordered costs assessed against Randy Molitor, Allstate Insurance Company and Zurich Insurance Company in solido. We amend that cost judgment to provide that costs in the district court be assessed only to Randy Molitor, Allstate Insurance Company, and Danny Glenn Lafleur, in solido.
We further order that the judgment of the trial court, insofar as it gives Danny Glenn Lafleur a credit for any amount which Zurich Insurance Company was liable or may be held liable to the plaintiffs in the principle demand, be amended to delete said provision of the district court judgment awarding any such credit.
It is further ordered that the costs of this appeal be assessed in equal portions against all appellants herein with the one exception that Zurich Insurance Company be relieved from the payment of any costs of this appeal.
As thus amended, the judgment of the district court is affirmed.
AFFIRMED, AS AMENDED.